555 A.2d 58

**Frank L. RIZZO and Lena Rizzo, Appellees,**

v.

**Barton A. HAINES, Esq., Appellant.**

Supreme Court of Pennsylvania.

Argued April 13, 1988.

Decided March 6, 1989.

488

James D. Crawford, Philadelphia, for appellant.

Herbert Braker, Louis Kattelman, Philadelphia, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

STOUT, Justice.

Barton A. Haines, Esquire, appeals from the order of the Superior Court, 357 Pa.Super. 57, 515 A.2d 321 affirming in part, and reversing and remanding in part, the judgment order of the Court of Common Pleas of Philadelphia County that held that he negligently, and in bad faith, conducted settlement negotiations for his client Frank L. Rizzo,[1] that he had fraudulently induced his client to transfer $50,000 to him, and that he improperly accounted for costs and expenses. The trial court entered a judgment against him in the amount of $530,000 in compensatory damages and $150,000 in punitive damages. In addition, the trial court denied Haines' recusal motion. In affirming the judgment, the Superior Court held that Haines must pay interest at the market rather than the statutory rate on the fraudulently-transferred monies. We affirm.

On September 20, 1968, Rizzo, while stopped in a vehicle at an intersection, was rear-ended by a City of Philadelphia police vehicle. At the time, Rizzo was an off-duty police officer for the City of Philadelphia. Rizzo's soft-tissue neck, back, and arm injuries, sustained in the accident, eventually worsened, and he came under the supervision of Henry T. Wycis, M.D. After three surgical procedures between September 29 and October 16, 1971, he became permanently partially paralyzed. Once a handsome and vital police officer, he became a comparatively helpless and pitiful invalid.

Rizzo originally retained Anthony J. Caiazzo, Esquire, to institute a suit against the City of Philadelphia [hereinafter *"City"* case]. Later he retained the law firm of Richter, Syken, Ross & Levant, which assigned the case to Haines, an associate with the firm. The relationship between Haines and the Richter firm deteriorated, and Haines left the firm. He copied the Rizzo file and took it and the client,

---

1. Appellee is not related to former Philadelphia Mayor Frank L. Rizzo.

who by this time had become a personal friend, with him.[2] Frank and Lena Rizzo, under Haines' counsel, instituted a medical malpractice action against Dr. Wycis and the hospital where the surgeries were performed [hereinafter "*Wycis*" case].[3] The instant action arises from Haines' representation of Rizzo in these two lawsuits.

Haines did not pursue consolidation of the two cases. Rather, after a failed attempt on the part of the City to join Dr. Wycis' estate,[4] the *City* case was listed for a jury trial before the Honorable Merna B. Marshall. The jury returned a verdict in favor of Mr. Rizzo for $450,000. Reassuring the Rizzos that the *Wycis* case was still viable, Haines recommended that Rizzo take the money. Neither party filed post-trial motions.

After the verdict in the *City* case, Judge Marshall, by agreement of those involved, conducted a fee dispute hearing, wherein Caiazzo and Haines argued for a portion of the one-third of the verdict that had been placed in escrow for the payment of legal fees. Citing dissatisfaction with the conduct of the attorneys, and with Haines' conduct during settlement negotiations, Judge Marshall ordered a return from the escrow fund, to Rizzo, of $50,000, and divided the remainder between the attorneys. Subsequently, Haines procured for himself from Rizzo, supposedly as a gift, a return of the $50,000.

Throughout the course of the *City* case, Haines repeatedly led the Rizzos to believe that the *Wycis* case had a recovery value of between $800,000 and $1 million. The record reveals, however, that there was insufficient evi-

2. The record reveals that Haines photocopied as many as six files during his last few months with the Richter firm without the firm's knowledge. The impropriety of such action is not before this Court.

3. Between the time of the filing of the *City* case and the *Wycis* case, the law of Pennsylvania changed to allow a wife to recover for loss of consortium as a result of her husband's injuries. *See Hopkins v. Blanco,* 457 Pa. 90, 320 A.2d 139 (1974).

4. Dr. Wycis had died during the pre-trial phase of the case. The Wycis estate filed preliminary objections to the joinder, which were sustained. *Rizzo v. City of Philadelphia,* 67 Pa.D. & C.2d 666, *aff'd,* 231 Pa.Super. 744, 327 A.2d 181 (1974).

dence of Dr. Wycis' malpractice to justify this figure. Furthermore, the doctor's professional liability insurance coverage was only $100,000. In addition, there was insufficient evidence that the hospital was negligent either in extending staff privileges to Dr. Wycis or in caring for Rizzo. On January 23, 1978, the *Wycis* case was dismissed on a summary judgment motion. The Honorable Harry A. Takiff dismissed the suit on the basis that, *inter alia*, the recovery in the *City* suit had fully compensated Rizzo for his injuries. *Rizzo v. Rohrback*, 8 Pa.D. & C.3d 122, *aff'd*, 261 Pa.Super. 455, 395 A.2d 995 (1978).

The Rizzos instituted the instant malpractice action against Haines alleging, *inter alia*, professional negligence in settling the *City* case, breach of fiduciary duties with respect to the $50,000 transfer, and improper accounting of costs and expenses. The case was tried without a jury before the Honorable I. Raymond Kremer. On January 18, 1984, the judge found for the Rizzos. He awarded $300,000 compensatory damage for negligent settlement, plus $150,-000 interest on that sum, calculated at the statutory rate of 6%. He also awarded a return of the $50,000 transfer, plus $25,000 in interest also calculated at the statutory rate. In addition, he awarded another $5,000, including interest, representing costs and expenses for which Haines had improperly accounted. Lastly, the court awarded $150,000 in punitive damages. Trial Ct. slip op. at 73. Both sides filed post-trial motions, Haines objecting to the judgment against him and the Rizzos objecting to the rate of interest applied to the judgment. On January 30, 1984, Haines filed a recusal motion, alleging that Judge Kremer had been involved in the *City* case in 1975. On June 20, 1985, Judge Kremer denied the post-trial motions and the motion to disqualify. The Superior Court affirmed, and held that, due to his breach of the fiduciary duty to Rizzo with regard to the $50,000 transfer, Haines must pay interest on that amount at the market rate rather than the statutory rate.

In reviewing the factual determinations of the trial court sitting as finder of fact, we must attribute to them the

same force and effect as a jury's verdict. *Cover v. Cushing Capital Corp.*, 344 Pa.Super. 593, 497 A.2d 249 (1985); *Snellbaker v. Herrmann*, 315 Pa.Super. 520, 462 A.2d 713 (1983). Accordingly, we view the evidence and all reasonable inferences therefrom in the light most favorable to the Rizzos, as verdict winners. *Wilson v. Benjamin*, 332 Pa. Super. 211, 481 A.2d 328 (1984); *Courts v. Campbell*, 245 Pa.Super. 326, 369 A.2d 425 (1976). We will only upset the findings if there is insufficient evidence, or if the trial court committed an error of law. *Penn State Constr. Inc. v. Cambria Sav. & Loan Ass'n*, 360 Pa.Super. 145, 519 A.2d 1034 (1987); *Piccinini v. Teachers Protective Mut. Life Ins. Co.*, 316 Pa.Super. 519, 463 A.2d 1017 (1983). In reviewing the findings, the test is not whether we would have reached the conclusion of the trial court, but rather whether we reasonably could have reached the same result. *Harrisburg School Dist. v. Pennsylvania Interscholastic Athletic Ass'n*, 453 Pa. 495, 309 A.2d 353 (1973); *Delahanty v. First Pa. Bank*, 318 Pa.Super. 90, 464 A.2d 1243 (1983). We will not substitute our judgment for that of the trial court. *Delahanty, supra.*

Viewed in this light, the facts surrounding the settlement negotiations of the *City* case are as follows. On March 5, 1974, at Haines' request, an informal conference was held in the office of Sheldon Albert, the Chief Deputy City Solicitor. After a "mini-trial" of Rizzo's position, Haines, with Rizzo's approval put forth $1.2 million as his client's initial settlement offer. N.T. 8/21/83 at 86–89; 4/29/83 & 5/2/83 at 24. The City did not accept this offer. Haines later provided the City with actuarial figures detailing his client's potential earnings as a police officer versus his earnings in other jobs that he conceivably could perform given his disability. N.T. 8/21/83 at 87–88; 4/29/83 at 69–70. The City never responded.

Again at Haines' request,[5] a pre-trial settlement conference was held before the Honorable John J. McDevitt, III.

5. Haines wrote the following letter:

At the April 2, 1975, meeting, the judge put an initial settlement range on the case of between $500,000 and $3,000,000. N.T. 7/21/83 at 107. Haines reiterated his client's demand of $1.2 million. Mr. Moran, a Deputy City Solicitor, responded by offering $300,000 plus a lifetime pension, which Haines did not accept. *Id.* Moran stated that although he needed approval from other departments within his office to effectuate the pension, he regarded the offer as "firm" because he believed he could accomplish it. *Id.* at 38. Sheldon Albert testified that Moran had the authority to settle in such a fashion. N.T. 4/29/88 at 11. Haines testified that, at the meeting, he neither inquired of the City what was involved in a lifetime pension, N.T. 4/27/83 at pm1–2, nor asked whether the pension was analogous to a structured settlement. *Id.* at pm6. He stated that he did not explore the pension because Rizzo previously applied to the City for a disability pension which the City denied after an administrative hearing because the accident did not occur while he was on duty. Rizzo therefore did not believe that the City could get him a pension. N.T. 4/29/83 & 5/2/83 at 27. Haines also did not explore the pension because he did not believe that Mr. Moran's remarks concerning the pension constituted a true offer. Rather, he thought that Moran made the remark in passing. N.T. 4/27/83 at pm4. He did, however, within one week of the conference, write two letters to Mr. Moran in which he specifically asked for an offer from the City, as well as for information concerning the pension. Mr. Moran did not respond to these letters. N.T. 7/21/83 at 104–08; N.T. 5/3/83 at 29.

Subsequently, Haines arranged for a second formal settlement conference. It transpired on Friday, April 18, 1975, three days before trial, in front of Judge Marshall. At the

In view of the Superior Court's affirmance of the dismissal of both additional defendants, coupled with the fact that a special listing has been granted for the trial in this case, perhaps a settlement discussion at this time might be meaningful.
N.T. 7/21/83 at 100–01.

meeting, Haines raised his settlement demand to $2 million.[6] In response, Moran made the only offer ever made by the City in writing. This offer was for $50,000. Moran testified that he lowered the offer because Haines had raised the demand. N.T. 5/3/83 at 12.

After the fourth day of trial, another settlement conference was held before Judge Marshall. The judge offered to lend her assistance in reaching settlement by putting a figure of $550,000 on the case. *Id.* at 13. Haines, without first consulting Rizzo, immediately rejected the figure. N.T. 4/27/83 at pm40. Moran, in response, did not offer the $550,000, because "if he is not going to accept it there is no point in me offering it." N.T. 5/3/83 at 14. During the course of trial, however, Moran did say to Haines, "Look, I've got more than 550, what do you really want," to which Haines' only response was "$2 million." *Id.* at 15. Haines did not inquire how much "more" the City was willing to pay. Moran further testified that he was authorized to settle at trial for $750,000. *Id.*

Rizzo testified that he had authorized Haines to settle the case for $700,000 to $750,000. N.T. 4/29/83 & 5/2/83 at 30, 161. He further testified that he never authorized Haines to raise the demand to $2 million, nor did Haines ever tell him he was going to do so. *Id.* at 128; N.T. 8/12/83 at 4, 30. He also testified that Haines never informed him that Judge Marshall had suggested the $550,000 settlement figure until after the case was over.[7] N.T. 4/29/83 & 5/2/83 at 160; N.T. 8/12/83 at 64.

In addition to the evidence detailing the specifics of the settlement negotiations, there was also evidence that Haines considered the opportunity to try the case to be a cornerstone in building his reputation as a successful plain-

6. Haines disputed this fact. He testified that his demand at this conference did not change from the initial $1.2 million. Therefore, in his view, it was the City's low offer of $50,000 that precluded agreement. N.T. 4/27/83 at pm29, pm33–34.

7. Haines testified that immediately after the meeting he told Rizzo about the $550,000 figure recommended by Judge Marshall, and that Rizzo rejected it. N.T. 7/22/83 at 116–17.

tiff's attorney. N.T. 4/27/83 at am49; 5/2/83 at 7–8; 5/3/83 at 8–9.

With regards to the $50,000 transfer, the evidence shows that Rizzo initially retained Caiazzo pursuant to a power of attorney under which Caiazzo was to receive a fee of 50% after expenses were deducted. Rizzo then retained the Richter firm. The power of attorney between Rizzo and the firm was for 40% after expenses. After Haines left the firm, Rizzo and Haines signed a power of attorney for a one-third contingent fee with Rizzo to pay his own medical expenses. After the May 1, 1975 verdict of $450,000 in the *City* case, Haines, Caiazzo, and the Richter firm were unable to agree on the allocation of legal fees and costs. By written agreement, on May 13, 1975, they submitted the dispute to Judge Marshall. Also by agreement, the attorneys established a fee escrow account in an amount representing one-third of the total recovery, from which the attorneys agreed to limit their fee. N.T. 4/28/83 at am36. In July of 1975, Haines and the Richter firm reached an agreement wherein the Richter firm would accept $25,000 in settlement of its claims. N.T. 7/26/83 at 35. Consequently, the firm was not a party to or present at the fee dispute hearings. Citing Haines' failed attempt at settlement, Judge Marshall surcharged the fund for $50,000, returned the sum to Rizzo, and stated that the sum "should be added to the amount of money distributed to the Plaintiff, Rizzo." Findings of Fact and Conclusions of Law 12 (Marshall, J.). The judge divided the remaining money, approximately $70,-000, evenly between Haines and Caiazzo.

Shortly after Judge Marshall issued Findings of Fact and Conclusions of Law in the fee dispute, Haines approached Rizzo and procured from him a return of the $50,000. N.T. 4/29/83 & 5/2/83 at 38. Haines told Rizzo that his practice was still not solvent, and that he needed the money to continue pursuing the *Wycis* case, which had a potential recovery value, according to Haines, of $800,000 to $900,-000. *Id.* After having sought independent legal advise from Leonard J. Bucki, Esquire, as to the propriety of the action, Haines drafted a letter wherein Rizzo agreed to the

transfer.[8] *Id.* at 126. Rizzo testified that he believed this
transfer to be a loan. *Id.* at 176–77. Haines did not inform
Judge Marshall, or Caiazzo, or the Richter firm of this
transaction. In addition, prior to the time that Rizzo trans-
fered the $50,000, Haines never showed him, or his wife,
Judge Marshall's Findings of Fact and Conclusions of Law,
wherein the judge found that Haines had improperly negoti-
ated settlement of the *City* case. *Id.* at 87; 5/18/83 at 2–3,
91–93; 8/12/83 at 32–33; Trial Ct. slip op. at 50.

Concerning alleged overreaching on fees and reimburse-
ments, the evidence shows that during the pendency of the
*City* case, Haines lent Rizzo approximately thirty or forty
dollars each week for cab fare and other nominal expenses,
for about eighteen or nineteen months. N.T. 5/18/83 at 96;
7/27/83 at 8–9. These transfers went largely undoc-
umented. After the verdict in the *City* case but before
resolution of the fee dispute, Rizzo gave Haines $30,000 in
cash, $20,000 of which was a loan in order to help Haines
proceed with the *Wycis* case. Haines had originally asked
Rizzo for $100,000, which Rizzo refused to lend. N.T.
8/12/83 at 12. Haines repaid $20,000 to Rizzo. The parties
dispute the remaining $10,000. Haines alleged that al-
though the status of the money was left "open" in order to
deal with changing circumstances, it basically represented a
$7,200 reimbursement for the personal advances that
Haines had made to Rizzo, as well as $2,800 for miscellane-

**8.** The *undated* letter stated:
> After having completely read and discussed the opinion of Judge
> Marshall and being fully advised by Mr. Haines that I have no legal
> responsibility to do so, I, nevertheless, wish to give Mr. Haines the
> $50,000 awarded to me by the Court. I disagree with Judge Mar-
> shall's opinion in this case, and know of the constant attention and
> efforts of Mr. Haines, who has kept the one of our case—who kept
> up [sic] completely informed of all documents, particularly those
> discussions of settlement, and whose performance we are complete-
> ly satisfied with right up to the present time.
>
> He was there when we needed him, and I want to live up to my
> agreement, because I feel it is only part of what he deserves for
> what he has done for myself and my family.
>
> Of course I fully understand that I have the right to counsel, any
> other attorney concerning [sic], but I have no desire to do so.
> N.T. 4/29/83 at 106.

ous legal services rendered to Rizzo and his family. N.T. 7/22/83 at 106–07; 7/27/83 at 11–31; 8/9/83 at 209–10. Rizzo stated that he thought the $10,000 was only for costs, and not for repayment of loans or for reimbursement of previously-incurred legal expenses. N.T. 8/12/83 at 14. There was no an agreement that Haines was to be reimbursed for these legal services. *Id.* at 14–15. In addition, Haines never showed him a cost sheet or otherwise accounted for expenses for the *City* case. *Id.* at 9–10. In the midst of trial, however, Haines produced his missing "black book," a ledger that detailed his costs and expenses.

Based on this evidence, the trial court found that Haines had negligently conducted settlement of the *City* case, that the $50,000 transfer was fraudulent and in violation of Haines' fiduciary duty, and that Haines had overreached on costs and expenses in the amount of $2,800. His settlement conduct was negligent, according to the trial court, in that he failed properly to "explore and elicit" good faith settlement offers from Mr. Moran. Trial Ct. slip op. at 19. The court stated:

It was Mr. Haines's duty to properly and sufficiently investigate and determine the value of such proffered pension or the meaning and significance of the settlement proposal advanced and suggested by the City at the conference before Judge McDevitt. Instead he failed to properly explore and learn the value of the City's proposal to pay plaintiff $300,000 plus a lifetime pension. He did not have the right to rely upon the plaintiff's uninformed and ill-informed "guesses" as to the availability of either a pension or a pension-equivalent. He was negligent in not pursuing *that* settlement proposal as a basis for negotiations. The City's offer of $300,000 plus a pension was either never properly "grasped" by the defendant or was negligently ignored by him because of his desire to try the case and establish a reputation as a negligence attorney. *It is true that Mr. Haines engaged in some letter writing and made some inquiries with regard to pension values and amounts, but there was no real excuse for him to fail to really get the informa-*

*tion he purportedly sought.* There were multiple sources available for such information, the most obvious of which were the City's pension personnel and actuarial sources.

*Id.* at 20 (emphasis added). The court continued:

The City of Philadelphia would have paid $550,000 in settlement, following Judge Marshall's recommendation during trial, and so indicated to defendant. After Judge Marshall's initial recommendation of $550,000 was refused by Mr. Haines, Mr. Moran still indicated that the City would pay more than $550,000 in settlement. Mr. Moran asked Mr. Haines, "I can get you more than $550,000. What do you really want?" Mr. Haines did not properly discuss that inquiry-offer with the plaintiff. He did not properly disclose Judge Marshall's recommendation or Mr. Moran's inquiry. He did not comply with a duty to properly inform plaintiff and to assure that plaintiff heard and understood. He did not properly and competently negotiate to elicit how much "more" would be paid. Instead he jumped to a $2,000,000 demand which was calculated to and intended to close off all discussions.

*Id.* at 22.

Concerning the propriety of the $50,000 transfer, the trial court stated:

It is very clear ... that Mr. Haines fraudulently and deceptively concealed ... Judge Marshall's recitations from Mr. Rizzo. Mr. Rizzo was never ... advised of any rights to contend that there were unrealistic refusals to negotiate. Mr. Rizzo was never given opportunity or advised of any rights to seek surcharges against Haines for improper handling of settlement negotiations. The plaintiff should have been given full opportunity to explore all of Judge Marshall's accusations and indications of malpractice and other improprieties and their effect upon entitlement to fees.

*Id.* at 45.

In his complaints of legal error, Haines argues that the trial court improperly imposed liability based on his exercise

of judgment on matters of strategy and tactics, and that the trial court improperly imposed on him a duty to elicit his adversary's undisclosed settlement authority. The court also erred, according to Haines, by holding that expert testimony was not needed to detail the appropriate standard of care, and by holding that the damages were not speculative. In addition, Haines asserts that the trial court improperly ignored authentic financial records that detailed his costs and expenses, erred by imposing punitive damages, and that the Superior Court erred in ordering the calculation of interest at the market rate rather than the statutory rate. Finally, Haines claims that the trial court erred in denying his recusal motion.

In *Schenkel v. Monheit,* 266 Pa.Super. 396, 405 A.2d 493 (1979), the Superior Court held that an allegedly aggrieved client must establish three elements in order to recover for legal malpractice. They are:

"1. The employment of the attorney or other basis for duty;

2. The failure of the attorney to exercise ordinary skill and knowledge; and

3. That such negligence was the proximate cause of damage to the plaintiff."

*Id.,* 266 Pa.Superior Ct. at 399, 405 A.2d at 494 (quoting R. Mallen & V. Levit, *Legal Malpractice* 123 (1977)). *See also Curran v. Stradley, Ronon, Stevens & Young,* 361 Pa.Super. 17, 521 A.2d 451 (1987). We believe that the necessity for an attorney's use of ordinary skill and knowledge extends to the conduct of settlement negotiations. As this Court stated in *Rothman v. Fillette,* 503 Pa. 259, 469 A.2d 543 (1983), in addition to the fact that settlement is the faster way to get money into the hands of the victims of tortious conduct,

"[v]oluntary settlement of civil controversies is in high judicial favor. Judges and lawyers alike strive assiduously to promote amicable adjustments of matters in dispute, as for the most wholesome of reasons they certainly should. When the effort is successful, the

parties avoid the expense and delay incidental to litigation of the issues; the court is spared the burdens of a trial and the preparation and proceedings that must forerun it."

*Id.*, 503 Pa. at 267, 469 A.2d at 546 (footnote omitted) (quoting *Autera v. Robinson,* 419 F.2d 1197, 1199 (D.C.Cir. 1969)). We recognize that a disappointed client may be inclined to subject his or her attorney to the standard that only hindsight may provide, and as a general policy there should be judicial reluctance to relitigate suits in the guise of legal malpractice. Nevertheless, as stated in *Gans v. Mundy,* 762 F.2d 338 (3d Cir.1985): "[A]n attorney's considered decision *involving at a minimum the requisite exercise of 'ordinary skill and capacity,'* and which is an 'informed judgment,' does not constitute malpractice." *Id.* at 341 (emphasis added). Therefore, an attorney may not shield himself from liability in failing to exercise the requisite degree of professional skill in settling the case by asserting that he was merely following a certain strategy or exercising professional judgment. Rather, the importance of settlement to the client and society mandates that an attorney utilize ordinary skill and knowledge.

 Consistent with ordinary skill and knowledge, it was incumbent upon Haines, as a matter of law, to communicate all settlement offers to his client. *See Whiteaker v. State,* 382 N.W.2d 112 (Iowa 1986); *Joos v. Auto–Owners Ins. Co.,* 94 Mich.App. 419, 288 N.W.2d 443 (1979); *Rubenstein & Rubenstein v. Papadakos,* 31 A.D.2d 615, 295 N.Y.S.2d 876 (1968), *aff'd,* 25 N.Y.2d 751, 250 N.E.2d 570, 303 N.Y.S.2d 508 (1969). *See also* Code of Professional Responsibility EC 7–7 (1974) (noting that it is exclusively for the client to decide whether to accept a settlement offer).[9] This rule derives from the settled principle that an attorney must

**9.** Similarly, the Rules of Professional Conduct provide:
> (a) A lawyer shall abide by a client's decisions concerning the objectives of representation ... and shall consult with the client as to the means by which they are to be pursued. *A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter.*

Rules of Professional Conduct 1.2(a) (1988) (emphasis added).

have express authority from the client to settle the case. *Archbishop v. Karlak*, 450 Pa. 535, 299 A.2d 294 (1973). Since the client's choice to accept or reject a settlement offer must be an informed one, we further believe that Haines was also under a duty to investigate the offers that were proposed by the City. *Cf. Snyder v. Queen Cutlery Co.*, 357 Pa.Super. 456, 516 A.2d 71 (1986) (failure to investigate potential claim can be grounds for malpractice). *See also Giaramita v. Flow Master Machine Corp.*, 234 N.Y. S.2d 817 (Sup.1962) (attorney is under duty to investigate every material phase of his or her client's case). Thus, contrary to Haines' assertion, the duty imposed by the trial court was not simply that he elicit his opponent's maximum settlement authority in the form of an offer. Rather, it was a duty to take reasonable steps to investigate the inquiries or offers that the City extended.

■ We cannot agree with the trial court, however, that Haines breached his duty to investigate the pension that the City offered. Although it is true that Haines was not justified in relying on the "ill-informed" guesses of his client, he took reasonable steps to ascertain the pension value. He wrote Moran and supplied him with earning figures. He also inquired of Moran what the pension offer entailed. Moran failed to respond to Haines' letters asking for more information. Moran, and not Haines, prevented the pension offer from becoming meaningful.

■ On the other hand, Haines clearly breached this duty to investigate settlement offers by failing to respond to Moran's comment at trial that he could get more than $550,000. Despite the comment, he took no steps to ascertain how much "more" the City was willing to pay. He also breached the duty to communicate this settlement offer to his client. Since the other elements of attorney malpractice have been met, we hold that breach of these duties is sufficient to support a malpractice action.

■ Concerning the necessity for expert testimony to establish the standard of care, in *Reardon v. Meehan*, 424

Pa. 460, 227 A.2d 667 (1967), this Court noted the general rule that expert testimony is essential where it would help the finder of fact understand an issue that is beyond the knowledge of the average person. Clearly, where the issues are not beyond such knowledge, the appropriate standard of care can be established without expert testimony. Where the issue is simple, and the lack of skill obvious, the ordinary experience and comprehension of lay persons can establish the standard of care. *Lentino v. Fringe Employee Plans, Inc.*, 611 F.2d 474 (3d Cir.1979) (applying Pennsylvania law).

■ Instantly, the Rizzos presented the expert testimony of M. Mark Mendel, Esquire. The trial court concluded that this expert made inaccurate factual assumptions in reaching some of his opinions, and therefore did not rely on this expert in reaching its conclusion that Haines violated the standard of care that he owed his clients. Nevertheless, we agree with the trial court that breach of the duty to investigate, and to inform one's client of, settlement offers does not require expert testimony. *See Joos, supra,* 94 Mich.App. at 423, 288 N.W.2d at 445 ("It is well within the ordinary knowledge and experience of a layman jury to recognize that ... the failure of an attorney to disclose [settlement offers] is a breach of the professional standard of care."). *See also Wright v. Williams,* 47 Cal.App.3d. 802, 810, 121 Cal.Rptr. 194, 200 (1975) ("In some circumstances, the failure of attorney performance may be so clear that the trier of fact may find professional negligence unaided by the testimony of experts."). Instantly, there was sufficient nonexpert testimony to support the finding that Haines breached the standard of care by failing to investigate and inform his client of the City's settlement offer.[10]

10. In light of our holding that a failure to investigate and communicate settlement offers is sufficient to support a legal malpractice claim, we leave for another day the trial court's conclusion that raising the demand to $2 million was negligent and its implicit conclusion that expert testimony was not needed to detail the appropriate standard of care concerning this raising of the settlement

■■ We further believe that expert testimony was not needed to detail the fiduciary obligations of an attorney who engages in financial transactions with his client, since these obligations are established by law, the Code of Professional Responsibility, and the Model Rules of Professional Conduct. In *Lynch v. Hook*, 298 Pa.Super. 27, 444 A.2d 157 (1982), the Superior Court stated: ·

It is well settled that transactions between attorneys and clients will be sustained only when good faith and full disclosures attend such transactions. "The relation [attorney and client] is so confidential in its nature that it calls for the exercise of the most perfect good faith ... [and] no shadow of anything like deception or unfair dealing upon the part of an attorney, can be countenanced." .... The law "often declares transactions between ... [attorneys and their clients] void, which between other persons would be unobjectionable....." When the propriety of a transaction between attorney and client has been put at issue, the burden is on the attorney to show by a preponderance of the evidence that his conduct has conformed to these strict standards.

*Id.*, 298 Pa.Superior Ct. at 29–30, 444 A.2d at 159 (citations omitted). *See also Meara v. Hewitt*, 455 Pa. 132, 314 A.2d 263 (1974). In addition, the Code of Professional Responsibility states:

A lawyer should not suggest to his client that a gift be made to himself or for his benefit. If a lawyer accepts a gift from his client, he is particularly susceptible to the charge that he unduly influenced or over-reached the client. If a client voluntarily offers to make a gift to his lawyer, the lawyer may accept the gift, but before doing so, he should urge that his client secure disinterested advice from an independent, competent person who is

demand. Whether proof of negligence arising from pretrial or trial settlement strategy is beyond the comprehension of laypersons and requires expert testimony depends on the particular facts and circumstances of the case. *Applegate v. Dobrovir, Oakes & Gebhardt*, 628 F.Supp. 378 (D.D.C.1985), *aff'd*, 809 F.2d 930 (D.C.Cir.1987); *Pongonis v. Saab*, 396 Mass. 1005, 486 N.E.2d 28 (1985).

cognizant of all the circumstances. Other than in exceptional circumstances, a lawyer should insist that an instrument in which his client desires to name him beneficially be prepared by another lawyer selected by the client.

Code of Professional Responsibility EC 5-5 (1974).[11]

The trial court stated:

> One of the lessons of this case is to warn the profession that the law will regard with the gravest suspicion—a virtually insurmountable suspicion—circumstances whereby an attorney procures his client's assets by way of supposed gift. It is intolerable that there be dealings between an attorney and client which permit the attorney to end up with the client's monies, with a dispute as to whether the transaction is one of gift or loan. The acquisition of the client's monies by an able-bodied attorney from a catastrophically and permanently injured and disabled client, for, *inter alia,* supposed purposes of gratitude must be regarded in law as a void obscenity. Such conduct demands language of judicial indignation and condemnation.

Trial Ct. slip op. at 61. Accordingly, there was no need for expert testimony to establish this standard of care.

 Haines also argues that the trial court erred in finding that the damages were not speculative. Clearly, "when it is alleged that an attorney has breached his professional obligations to his client, an essential element of the cause of action, whether the action be denominated in assumpsit or trespass, is proof of actual loss." *Duke & Co. v. Anderson,* 275 Pa.Super. 65, 73–74, 418 A.2d 613, 617 (1980). "The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of

---

**11.** Similarly, the Model Rules of Professional Conduct provides:

(c) A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent, child, sibling, or spouse any substantial gift from a client, including a testamentary gift, except where the client is related to the donee within the third degree of relationship.

Rules of Professional Conduct 1.8(c) (1988).

future harm—not yet realized—does not suffice to create a cause of action for negligence...." *Schenkel v. Monheit, supra,* 266 Pa.Super. at 399, 405 A.2d at 494 (quoting *Budd v. Nixen,* 6 Cal.3d 195, 200, 491 P.2d 433, 436, 98 Cal.Rptr. 849, 852 (1971)). "The test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages.... Thus, damages are speculative only if the uncertainty concerns the *fact* of damages rather than the amount." *Pashak v. Barish,* 303 Pa.Super. 559, 561–62, 450 A.2d 67, 69 (1982) (quoting R. Mallen and V. Levitt, *supra,* § 302, at 353–54 (2d ed. 1981)). *See also Mariscotti v. Tinari,* 335 Pa.Super. 599, 485 A.2d 56 (1984). A verdict may be based on a calculation of damages where there is a reasonable basis for the calculation. *Aiken Indus. v. Estate of Wilson,* 477 Pa. 34, 383 A.2d 808 (1978).

▮ Thus, in order for one to prevail on a claim of legal malpractice, one must establish that the party against whom the initial claim was asserted, in this case the City, would have reached agreement upon a settlement in an ascertainable amount. R. Mallen & V. Levit, *supra,* § 580, at 729–31. Sheldon Albert testified that Mr. Moran had the authority to settle the case for $300,000 plus a lifetime pension, and Mr. Moran testified that, at trial, he had the authority to settle the case for $750,000. Thus, this case is distinguishable from *Fuschetti v. Bierman,* 128 N.J.Super. 290, 319 A.2d 781 (1974), and *Campbell v. Magana,* 184 Cal.App.2d 751, 8 Cal.Rptr. 32 (1960), cited by Haines. In *Fuschetti,* the court held that expert testimony concerning reasonable settlement value was inadmissible, because "no expert can suppose with any degree of reasonable certainty the private blends of hopes and fears that might have come together to produce a settlement...." *Id.* 128 N.J.Super. at 296, 319 A.2d at 784. *Fuschetti* revealed no evidence of settlement offers or authority by either side. In *Campbell,* the court held that where the only offer was for $350, and the plaintiff stated that "she would settle for nothing less

than $100,000," the court held that the possibility of settlement was speculative. 184 Cal.App.2d at 758, 8 Cal.Rptr. at 36. Instantly, the offers and settlement authority were significantly closer. Similarly, in *Whiteaker v. State, supra*, the court held that the damages were speculative where there was no evidence that offers were in fact made, or that the attorney had authority to settle for a definite amount. 382 N.W.2d at 116. Instantly, firm settlement offers *were* communicated to Haines, and the attorney making the offers had the authority to settle. In addition, Haines was authorized to settle at about $750,000. Thus, we are unpersuaded by Haines' assertion that the damages were uncertain. The trial court awarded $300,000 in compensatory damages based on the difference between Rizzo's actual recovery and what he would have recovered except for Haines' negligence. We believe that this calculation was proper.

 Concerning the trial court's finding that he had overreached on costs and expenses, Haines argues that the trial court impermissibly ignored his "black book," which apparantly detailed his costs. In paragraph 38 of Haines' answer to the complaint, however, he stated that the $10,-000 was for repayment of advances or loans, making no reference to sums owed for legal fees. In *Tops Apparel Mfg. Co., Inc. v. Rothman*, 430 Pa. 583, 244 A.2d 436 (1968), this Court stated: "Admissions of this type, i.e., those contained in pleadings, stipulations, and the like, are usually termed 'judicial admissions' and as such cannot later be contradicted by the party who has made them." *Id.*, 430 Pa. at 587, 244 A.2d at 438 (footnotes omitted). Such pleadings are conclusive in the cause of action in which they are filed. *Dale Mfg. Co. v. Bressi*, 491 Pa. 493, 421 A.2d 653 (1980). Where there exists in the record a basis for the possibility that an averment is true, the trial court abuses its discretion if it ignores the admission. *Silco Vending Co. v. Quinn*, 315 Pa.Super. 367, 461 A.2d 1324 (1983). Obviously, this rule applies regardless of the *method* by which the party seeks to contradict his prior admission.

Therefore, the fact that Haines introduced documentary evidence of his costs and expenses is of no import.

Although noting that Haines' answers did constitute a judicial admission, the trial court nonetheless admitted this evidence. It simply did not accept the belated accounting and explanation that Haines offered. Trial Ct. slip op. at 76 n. 39. We believe that there was sufficient evidence to support the finding that Haines overreached on costs and expenses.

Haines also argues that the trial court erred by imposing $150,000 in punitive damages. This Court has adopted Section 908(2) of the Restatement (Second) of Torts regarding the imposition of punitive damages. That provision permits punitive damages for conduct that is "outrageous because of the defendant's evil motives or his reckless indifference to the rights of others." Restatement (Second) of Torts § 908(2) (1977). *See Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984); *Chambers v. Montgomery*, 411 Pa. 339, 192 A.2d 355 (1963). A court may award punitive damages only if the conduct was malicious, wanton, reckless, willful, or oppressive. *Chambers*, 411 Pa. at 344–45, 192 A.2d at 358. The proper focus is on "the act itself together with all the circumstances including the motive of the wrongdoer and the relations between the parties...." *Id.*, 411 Pa. at 345, 192 A.2d at 358. In addition, the actor's state of mind is relevant. The act or omission must be intentional, reckless, or malicious. *Feld*, 506 Pa. at 396, 485 A.2d at 748.

Based on this standard, we believe that the trial court acted properly in awarding the Rizzos $150,000 in punitive damages. Haines used his confidential position to persuade his injured client and good friend that he should transfer to him the $50,000 that Judge Marshall had awarded him due to Haines' misconduct. Haines secured this transfer after intentionally withholding Judge Marshall's findings of misconduct, in order to evade her ruling. He also secured this transfer by telling his client that he needed the money to pursue a claim against the doctor and

the hospital. That claim, however, proved meritless. In addition, he overreached on costs and expenses. These breaches of fiduciary duty, intentional withholding of critical information and fraudulent misrepresentation, were more than sufficient to justify the punitive damage award. *Delahanty, supra.*

■■■ Haines also argues that the Superior Court erred in calculating interest on the $50,000 transfer at the market rate rather than the statutory rate. The Pennsylvania legislature has provided for prejudgment interest in breach of contract cases at the statutory rate of six percent per annum. 41 Pa.Stat.Ann. § 202 (Purdon Supp.Pamph.1988). In *Citizens Natural Gas Co. v. Richards,* 130 Pa. 37, 18 A. 600 (1889), this Court articulated the rule for tort cases:

> In [tort] cases the party chargeable cannot pay or make tender until both the time and the amount have been ascertained, and his default is not therefore of that absolute nature that necessarily involves interest for the delay. But there are cases sounding in tort, and cases of unliquidated damages, where not only the principle on which the recovery is to be had is compensation, but where also the compensation can be measured by market value, or other definite standard.... Into these cases the element of time may enter as an important factor, and the plaintiff will not be fully compensated unless he receive, not only the value of his property, but receive it, as nearly as may be, as of the date of his loss. Hence it is that the jury may allow additional damages, in the nature of interest, for the lapse of time.

*Id.,* 130 Pa. at 39–40, 18 A. at 600. The flexible approach that this Court has taken concerning interest was articulated in *Murray Hill Estates, Inc. v. Bastin,* 442 Pa. 405, 276 A.2d 542 (1971):

> [T]he decided trend of courts of law and of equity has been "to break away from hard and fast rules and charge and allow interest in accordance with principles of equity, in order to accomplish justice in each particular case."
> .... Unless a case be found, which is a conclusive

precedent, the safest and at the same time the fairest way for a court is to decide questions pertaining to interest according to a plain and single consideration of justice and fair dealing.

*Id.*, 442 Pa. at 410, 276 A.2d at 545 (quoting *McDermott v. McDermott*, 130 Pa.Super. 127, 130, 196 A. 889, 890 (1938)). Moreover, in *In re Kenin*, 343 Pa. 549, 23 A.2d 837 (1942), this Court stated:

Damages for the detention of money under the circumstances here present should be measured by what the money so detained would have produced if it had been delivered to those entitled to it.

*Id.*, 343 Pa. at 564, 23 A.2d at 844.

▆ Consistent with this precedent, we believe that the Superior Court was correct in holding that Haines must pay interest at the market rate on the $50,000 that he fraudulently induced his client to transfer to him. Courts in this Commonwealth should not permit a person guilty of fraudulently withholding the funds of another to profit therefrom. *Brooks v. Conston*, 364 Pa. 256, 72 A.2d 75 (1950). *See also Lexington Ins. Co. v. The Abington Co.*, 621 F.Supp. 18 (E.D.Pa.1985). Accordingly, where funds are wrongfully and intentionally procured or withheld from one who seeks their restoration, the court should calculate interest on these monies at the market rate.

▆ Lastly, Haines argues that the trial court erred in failing to grant his recusal motion. Haines asserts that Judge Kremer acquired extrajudicial knowledge of disputed evidentiary matters while an attorney in 1975, that he had *ex parte* communications with some of the witnesses concerning the case, that he had personal bias or prejudice against him and his attorney, and that the judge made himself a witness on the motion to disqualify.

This case presents us with the opportunity to reaffirm the our holding in *Reilly v. Southeastern Pa. Trans. Auth.*, 507 Pa. 204, 489 A.2d 1291 (1985), that recusal motions must

be timely filed. Since Haines failed to do so, his motion must be dismissed.

The record reveals that on December 15, 1983, three months after completion of the trial, Judge Kremer conducted a conference in chambers for the purpose of settling the malpractice case. N.T. 12/15/83. At this conference, the judge stated on the record that although he had not made a final decision, he did have a "strong recommendation" from his law clerk. *Id.* at 3. The parties then agreed to off-the-record settlement discussions separately with the judge. *Id.* at 7–8. Haines did not make a motion for recusal at this time.

On January 3, 1984, Haines' counsel wrote the judge and requested ten additional days to negotiate settlement. On January 12, 1984, Haines' counsel again wrote the court, stating that "certain information has recently come to our attention which indicates that Your Honor was previously involved in the formation of the operative facts which gave rise to this law suit." Trial Ct. slip op. sur recusal at 4. The letter asked the judge to voluntarily recuse himself. The letter also stated, "[u]ntil this matter is resolved, we expect that no decision in favor of either party will be made in this case." *Id.* The letter contained no details as to the foundation for recusal.

On January 18, 1984, the judge conducted another meeting wherein Haines again suggested that the judge voluntarily recuse himself. He alleged that the judge, as a lawyer in 1975, was involved in the "formation of the operative facts" of the fee dispute hearing before Judge Marshall. Specifically, Haines alleged that the judge had knowledge of an affidavit in which the Rizzos made charges against members of the Richter firm, that he was consulted, as an attorney, concerning these charges, and that he had knowledge of the fee dispute hearings and the Findings of Fact and Conclusions of Law of Judge Marshall. When pressed for specifics, Haines' counsel stated, "[w]e are not willing to produce what evidence we have." *Id.* at 50. Judge Kremer then refused to recuse himself voluntarily,

because he did not remember ever having had contact with anyone concerning the case. N.T. 1/18/84 at 34–35. Counsel for Haines then told the court that he would file a formal motion to disqualify within forty-eight hours. *Id.* at 64. The judge then entered a finding against Haines, as he had previously stated he would do, and granted him leave to file a motion to disqualify.

Twelve days later, on January 30, 1984, Haines filed a formal recusal motion, supported by the affidavits of himself and of his counsel, wherein they stated that on January 6, 1984, at a cocktail party, they were told by a former member of the Richter firm and former associate of Haines that he, the former associate, had heard second-hand of attorney Kremer's involvement. Haines and his counsel did not submit an affidavit from this individual. The trial court, however, did permit Haines to take depositions from several former members of the Richter firm.

 Based on this evidence, the trial court concluded that the recusal motion was untimely, insufficient, and filed in bad faith. We agree. In *Reilly v. SEPTA, supra,* this Court enunciated the rule concerning the substance of a recusal motion: "When circumstances arise during the course of a trial raising questions of a trial judge's bias or impartiality, it is still the duty of the party, who asserts that a judge should be disqualified, to allege by petition the bias, prejudice or unfairness necessitating recusal." *Id.,* 507 Pa. at 220, 489 A.2d at 1299. *See Commonwealth v. Darush,* 501 Pa. 15, 459 A.2d 727 (1983) (vague, unsubstantiated hearsay references do not compel recusal). Moreover, the party seeking recusal must present sufficient information in a timely fashion. *Reilly,* 507 Pa. at 222, 489 A.2d at 1300. Instantly, Haines allegedly obtained the information at a cocktail party on January 6, 1984, and also on January 18, 1984. When pressed for specifics, however, he refused to divulge his information. It was not until twelve days after entry of the verdict that Haines produced any information concerning Judge Kremer's involvement in the case.

With regard to the assertion that the trial court communicated *ex parte* with witnesses, Haines had actual knowledge eight months before the December 15, 1983, conference that the trial court was in the process of conducting other cases and that it needed to discuss scheduling with some of the witnesses. The trial court specifically asked if the parties had an objection to this procedure, and Haines responded in the negative. N.T. 4/29/83 & 5/2/83 at 43–44. Finally Haines' assertion that the trial court made statements off the record that indicated that the trial court was biased against him and his attorney at the December 15, 1983, conference was not raised until January 30, 1984, forty-six days later. No attempt was made to memorialize those comments on the record at the meeting. Accordingly, the trial court acted within its discretion in denying the recusal motion due to untimeliness.

Even if Haines had filed the recusal motion in a timely fashion, we affirm the trial court's finding that the motion was meritless. A party who petitions for recusal bears the burden of producing evidence that establishes bias, prejudice, or unfairness. *Commonwealth v. Perry*, 468 Pa. 515, 364 A.2d 312 (1976); *Feingold v. Hill*, 360 Pa.Super. 539, 521 A.2d 33 (1987). We will not upset a determination by the trial court that a party has failed to carry this burden absent a clear abuse of discretion. *Reilly v. SEPTA, supra.* Instantly, there is no evidence that the trial court acted as a lawyer for the Richter firm or any member thereof. Any contact between then-attorney Kremer, now-Judge Kremer, and members of the Richter firm was extremely brief and did not concern the issues over which the court sat as finder of fact, namely, Haines' alleged negligent settlement of the City case. Accordingly, this issue is without merit.

Lastly, Judge Kremer did not impermissibly act as a witness in the recusal motion, under *Municipal Publications, Inc. v. Court of Common Pleas*, 507 Pa. 194, 489 A.2d 1286 (1985). There, this Court held that it was impermissible for the trial court to permit itself to be called as a witness and to testify concerning its conduct. *Id.*, 507 Pa.

at 201, 489 A.2d at 1289. Instantly, when told of the motion for recusal, Judge Kremer merely assured the litigants that he had no knowledge of any prior involvement by him in the case. This is no different from the trial court's assurances in *Reilly* that it bore no antipathy toward a litigant. These comments by the trial court do not violate *Municipal Publications*, and thus the trial court acted properly in denying the recusal motion.

The Order of the Superior Court is affirmed.

FLAHERTY, J., joins the majority opinion and files a concurring opinion in which ZAPPALA, J., joins.

PAPADAKOS, J., concurs in the result.

FLAHERTY, Justice, concurring.

I join the majority but express my concern about creating precedent which imposes liability on an attorney for a settlement strategy and for not "second guessing" a jury or being unaware of the actual limits of authority of an opposing attorney during settlement negotiations of a civil law suit; certainly a dangerous step and one which should be approached with the utmost caution. I do not believe, however, this case sets such a precedent.

ZAPPALA, J., joins this concurring opinion.