**Woods v. Egler**

506

C.P. of Allegheny County, no. GD 98-7998.

*Herbert A. Terrell,* for plaintiffs.
*Kathryn L. Simpson,* for defendant.

BAER, *J.,* August 8, 2001—Plaintiffs-appellants are Robert Woods and three corporations, First American Corporation, Approved Mortgage Corporation and G. Woods Mortgages owned and operated by Woods. Defendant/appellee is Attorney James F. Egler Jr. Woods and Corporations brought this action against Egler claiming legal malpractice, breach of contract, misrepresentation and breach of fiduciary duty. We granted Egler's motion for compulsory nonsuit on all counts, and Woods and Corporations have appealed.

Woods had been in the business of purchasing, selling and liquidating mortgages since 1960. In 1982, Woods began to focus on buying purchase money mortgages.[1] At some point, Woods incorporated Corporations and began to conduct the business of buying purchase money mortgages through them. In 1993, Woods decided to sell

1. In a purchase money mortgage transaction, the owner of real property sells it to the buyer and takes back a mortgage and mortgage note for all or some of the purchase price. The buyer then owes the mortgaged amount to the seller. Woods would go to the seller, pay him a negotiated amount, be assigned ownership of the mortgage and mortgage note and, therefore, own the right to collect the proceeds previously due from buyer to seller.

shares in Corporations to investors sought from the general public.[2] Woods represented to the public that the shares being sold in Corporations were a safe investment because they were collateralized by the underlying mortgages. Woods sold 12 to 14 shares in Corporations for $158,000 within a couple months of when he began to seek investors.

Not long after Woods began seeking investors for Corporations, the Federal Securities and Exchange Commission (SEC) brought a lawsuit to enjoin Woods' public offering. The case was litigated in the United States District Court for the Western District of Pennsylvania. Eventually the court agreed with the federal government and enjoined Woods from selling shares in Corporations. Woods' testimony is that at that juncture Corporations owned approximately 22 mortgages. The federal court decided these mortgages should be sold and the money raised should be returned to the investors. The court appointed First Keystone Financial Management as Receiver and Aderson, Frank and Steiner, P.C., a Pittsburgh law firm, as counsel for Receiver.

According to Woods, Receiver eventually collected $260,000 and spent $134,000.[3] Receiver and Law Firm eventually petitioned the federal court for approval of these fees. Woods, through counsel, filed an answer con-

---

2. In the vernacular, Woods "went public."

3. In actuality, it appears beyond dispute that Receiver charged $114,881.50 and Law Firm charged $30,351.23. These numbers come from both Attorney Aderson's testimony and from the record in this case. We, nevertheless, accept Woods' representation that $134,000 was spent to insure that we have resolved any conflict in evidence in his favor because he suffered nonsuit of his case. See *Storm v. Golden,* 371 Pa. Super. 368, 373, 538 A.2d 61, 63 (1988).

tending that the fees and expenses were too high. The issue went to hearing before the federal court. During that hearing, in open court, Woods fired his lawyer. The court permitted him to represent both himself and Corporations for the duration of the proceedings at the trial court level. After the hearing, the court entered an order and supporting opinion dated May 20, 1996, approving the fees and expenses.[4]

Woods filed a timely appeal to the United States Circuit Court for the Third Circuit on behalf of himself and Corporations. The Third Circuit notified Woods that while he could represent himself, he could not represent Corporations. Woods had been advertising for lawyers for years and in November of 1993 had received a response to his advertisement from Egler. Woods now thought of Egler as appropriate counsel for Corporations because Egler's background included stints as counsel to the Pennsylvania Securities Commission and as an assistant district attorney. During the course of their telephone conversations and a meeting, Woods learned that Egler also had appellate experience.

In late August of 1996, Woods gave Egler various documents related to the appeal of the approval of Receiver's and Law Firm's costs and fees. Egler said he would look them over to decide whether he would accept the case. He subsequently told Woods he would represent Corporations and that the case would take 20 hours

---

4. The federal trial court proceedings were before the distinguished jurist and former Chief Judge of the Western District, the Honorable Maurice B. Cohill Jr. Judge Cohill's opinion was entered as an exhibit in this case. While we do not rely upon it for any substantive evidence, we recommend its reading to give one a flavor of the federal litigation which culminated in the case before us.

to litigate. Egler agreed to an hourly fee of $50, and on August 26, 1996, acting on behalf of Corporations, Woods paid Egler $1,000. Woods' testimony is that at this juncture he believed Egler would protect the Corporations' interest by filing an appeal.[5]

Woods and Egler never spoke again before October 7, 1996, when the Third Circuit dismissed the appeals filed by Corporations. In substance, what the Corporations had not done was to have an attorney enter an appearance on their behalf. On October 26, 1996, Egler returned Woods' file. Woods individually filed a brief and fully litigated his appeal before the Third Circuit in his individual capacity. The Corporations did not participate further after their cases were dismissed. The Third Circuit eventually affirmed the trial court and thereby approved Receiver's and Law Firm's fees and costs.

In 1998, Woods and the Corporations brought this action against Egler contending that he had committed legal malpractice, breached the contractual and fiduciary duties arising when a client retains an attorney and committed the tort of misrepresentation during his representation of Corporations. The case eventually went to trial before a jury and at the conclusion of Woods' case, this court granted Egler's motion for compulsory nonsuit.

---

5. Woods' testimony in this regard is confused. Woods had already perfected the appeal on Corporations' behalf. What Egler needed to do was enter an appearance on behalf of Corporations. Thus, when Woods testified about Egler filing an appeal, what he intended to say was Egler would enter an appearance.

It is important to remember that all of these facts are vigorously contested. As earlier noted, we are setting forth the history of this case accepting Woods' and Corporations' versions of all contested facts because we granted Egler's motion for compulsory nonsuit.

Woods and Corporations filed post-trial motions which we denied. They then appealed. This is our Rule 1925 opinion explaining our grant of compulsory nonsuit.

As mentioned in previous footnotes, we are well aware that compulsory nonsuit can only be granted after a plaintiff is given the benefit of all favorable evidence, all reasonable inferences drawn therefrom, and the resolution of any conflict in evidence, and still clearly has not established a cause of action. *Matthews v. Unisource Worldwide Inc.,* 748 A.2d 219, 220 (Pa. Super. 2000); *Joyce v. Boulevard Physical Therapy & Rehabilitation,* 694 A.2d 648 (Pa. Super. 1997), *appeal denied,* 559 Pa. 711, 740 A.2d 1148 (1999); *Storm v. Golden,* 371 Pa. Super. 368, 373, 538 A.2d 61, 63 (1988), *appeal denied,* 524 Pa. 630, 574 A.2d 71 (1989).

With this standard firmly in mind, we turn to why we granted nonsuit beginning with Woods' and Corporations' claim that Egler committed legal malpractice. To state a claim for legal malpractice, the aggrieved client must establish: (1) that the parties were in an attorney-client relationship; (2) that the attorney failed to exercise ordinary skill or knowledge; and (3) that the attorney's failure to exercise ordinary skill and knowledge was the proximate cause of damage to the client. *Bailey v. Tucker,* 533 Pa. 237, 621 A.2d 108 (1993); *McMahon v. Shea,* 547 Pa. 124, 688 A.2d 1179 (1997); *Rizzo v. Haines,* 520 Pa. 484, 555 A.2d 58 (1989). For purposes of this appeal, we accept that Corporations had established an attorney-client relationship with Egler.[6] We therefore must consider whether Woods and Corporations set forth a

---

6. As is discussed, *infra,* Woods had no attorney-client relationship with Egler. For this reason also, his claim fails.

cause of action that Egler failed to exercise ordinary skill and knowledge, and whether any such failure was the proximate cause of damage to Woods or Corporations.

As with other malpractice actions, expert testimony is required to establish negligence in a legal malpractice action unless the issue to be put to the jury is so simple that a layperson can understand it without expert testimony. *Rizzo v. Haines, supra,* at 502, 555 A.2d at 66; *Thompson v. Glenmede Trust Co.,* 1996 WL 635682 (E.D. Pa.) *man. denied,* 56 F.3d 476 (interpreting and applying Pennsylvania law in granting the federal equivalent of compulsory nonsuit in a legal malpractice action for failure to produce expert testimony); see also, *Bierstein v. Whitman,* 360 Pa. 537, 541, 62 A.2d 843, 845 (1949) (a dental malpractice case dismissed by nonsuit for failure to present expert testimony).

Toward the end of Woods' and Corporations' cases, but before they rested, we called counsel to side-bar to insure that we understood their theories. We were well aware Woods and Corporations did not have an expert and Egler would be moving for compulsory nonsuit on this basis after all plaintiffs rested. The question we were pondering was whether the jury was capable, without the benefit of expert testimony, of understanding whether the failure to enter an appearance constituted legal malpractice under the facts of this case. However, Woods and Corporations desired to argue that Egler's malpractice went much further. At pages 113-20 of the transcript, Woods and Corporations' counsel stated explicitly and insistently his clients' desire to argue that Egler committed malpractice by failing to investigate all of the files adequately, failing to review the case sufficiently to determine whether it was meritorious, failing to skillfully

prepare the case and failing to enter an appearance. Moreover, at page 122, Woods and Corporations' counsel argued that it was malpractice for Egler to fail to go to the federal clerk of court's office to review the docket and file there.

Without expert testimony to guide it, a jury is simply not able to determine the nature, type and extent of review and preparation an attorney must go through before entering an appearance and prosecuting a case on appeal. Must the attorney merely read the prothonotary's file, or, in addition, retrieve and review the original trial transcripts and exhibits? Must the attorney check factual representations in the trial transcript against original sources to determine the veracity of his clients and their witnesses? Must an attorney research the case sufficiently to determine if it has some merit and, if so, then go on to evaluate the case's likelihood of success? How long should all of this take and what should be done in the process?

The law is settled that a jury cannot be permitted to reach a decision on the basis of speculation or conjecture. *Cruet v. Certain-Teed Corp.*, 432 Pa. Super. 554, 557, 639 A.2d 478, 479 (1994); *Biddle v. Johnsonbaugh*, 444 Pa. Super. 450, 664 A.2d 159 (1995). If this case had gone to the jury on this record, with Woods and Corporations making the proposed arguments, this rule would have clearly been violated and there would have been substantial potentiality of an unjust verdict. The issues, as insisted upon and outlined by Woods and Corporations' counsel, were far too complex to be presented to a jury without the guidance of expert testimony.

The third element of a legal malpractice action is damage to the client. To show damage, the client must estab-

lish that it would have prevailed in the underlying action. This is known as winning the "case within the case." *Kituskie v. Corbman,* 552 Pa. 275, 714 A.2d 1027, 1030 (1998); *Rizzo v. Haines, supra,* 520 Pa. at 499, 555 A.2d at 65*(1989)*. See also, *Duke & Co. v. Anderson,* 275 Pa. Super. 65, 71, 418 A.2d 613, 615 (1980). In the instant case, Woods individually litigated it to fruition in the Third Circuit and lost.[7] Woods fired his counsel before Judge Cohill in open court and testified in our case that he did so because he knew more about the facts and was better able to handle the case himself. He litigated fully in the District Court and the Third Circuit losing both times. During the trial we presided over, Corporations and Woods did nothing more than rehash the same evidence. They placed nothing into the record that would indicate that Corporations' results before the Third Circuit would have been different than the results obtained by Woods. On this ground also, we were required to grant nonsuit.

Woods and the Corporations next claim that we erred by merging their claims for breach of contract, misrepresentation and breach of fiduciary duty into the tort claim, and then dismissing them. While we considered doing that, we did not. A reading of the transcript will reveal that we considered these three additional claims separately, and granted Egler's motion for nonsuit as to each of them.

---

7. Egler argued that Woods' failure before the Third Circuit collaterally estopped him and the Corporations from proceeding. As we have decided this case on different grounds, we need not address this issue.

We turn first to Woods' and Corporations' averments that Egler breached a contract between them. In *Duke & Co. v. Anderson, supra,* plaintiff employees contended that Duquesne Beer Company and two of its officers had been unjustly enriched when the company withheld death benefits that employees claimed were in substance deferred wages. The *Pittsburgh Post-Gazette* reported the dispute and the employees' contentions. The two Duquesne Beer officers named instructed their counsel to file a defamation action. He never did, and after the statute of limitations for defamation had run, the officers sued the attorney contending that he had breached a contract with them.

The trial judge treated the assumpsit claims as a tort action for legal malpractice, and granted a compulsory nonsuit upon finding that employees had not proven that they could prevail on the case within the case. The Superior Court upon thorough and thoughtful analysis found that no public policy would be served by permitting what was substantively a legal malpractice case to proceed in assumpsit and thereby permit a plaintiff to avoid proving the case within the case. Moreover, the court found that two public policies were served by prohibiting malpractice actions from proceeding as contract claims. Lawyers would not feel compelled to file frivolous lawsuits and thereby violate the Canons of Ethics to avoid a contract claim. *Id.* at 616 citing ABA Code of Professional Responsibility EC 7-4 providing: "[A] lawyer is not justified in asserting a position in litigation that is frivolous." Additionally, lawyers would not feel compelled to pay damages to avoid embarrassment or humiliation when plaintiffs had not been harmed in the underlying

case but, nevertheless, brought or threatened to bring a contract action. *Id.* On these bases, the Superior Court affirmed the trial court and held that the alleged assumpsit case should be judged by a tort standard and dismissed because employees had not put evidence into the record sufficient to show that there was any likelihood of prevailing on the underlying case. *Id.,* 275 Pa. Super. at 73, 418 A.2d at 616, 617.

In *Hoyer v. Frazee,* 323 Pa. Super. 421, 470 A.2d 990 (1984), clients claiming an attorney committed error in a real estate action brought a case against the attorney alleging both legal malpractice and breach of contract. As in *Duke,* the trial court applied a tort analysis to both counts, and found for defendants. The Superior Court analyzed the case and found that the assumpsit claim was identical to the negligence claim and, therefore, sounded in tort. Accordingly, the Superior Court decided it was appropriate to employ a tort analysis in determining the case. *Id.* at 426, 470 A.2d at 992-93; see also, *Storm v. Golden, supra,* 371 Pa. Super. at 378, 538 A.2d at 65 (an assumpsit claim is not a true contract claim but, rather, sounds in negligence when it alleges a defendant failed to follow the appropriate standard of care). In the instant case, the gravamen of Woods' claim is that Egler failed to exercise the ordinary skill and knowledge required by an attorney. Thus, as in the above-cited cases, there is not a true breach of contract claim here. Rather, this is in essence a negligence case and, as already stated, fails to state a claim under that theory.

Egler also contends the same operative facts give rise to a misrepresentation claim and a breach of fiduciary duty claim. There are no facts in this record to indicate

Egler misrepresented anything. Additionally, there are no facts to indicate there was a fiduciary duty between Egler and Woods except that which arises in every attorney-client relationship. As with the contract claim, these counts are no more than creative pleadings of what is essentially a legal malpractice case. Accordingly, under the same rationale, these counts were properly dismissed on nonsuit. See *Thompson v. Glenmede Trust Co.,* 1996 WL 635682, 8 at note 11 (E.D. Pa.). (Applying Pennsylvania law and dismissing counts for breach of contract, breach of fiduciary duty and fraud after determining that plaintiff's complaint was, in substance, a legal malpractice case that failed for failure to provide expert testimony regarding the appropriate standard of care.)

We turn very briefly to the two evidentiary objections preserved by Woods. We note that neither is relevant to the outcome of this case. If Egler's counsel had never made an objection or we had overruled all of her objections, Woods would have still failed miserably in attempting to state a claim.

Having said this, there was no error. Woods' attorney called Egler as if on cross and began to scrutinize his legal research. He first asked whether Egler read any cases, to which Mr. Egler responded "yes." The attorney then asked, "Well, in your research did you read a 1966 case?" There was an objection, which was sustained. Obviously, the question was improperly vague. This issue is simply not worthy of further comment.

The second evidentiary issue arose from Woods' counsel's attempt to have his client read into the record testimony from the prior federal litigation concerning the difference between what the Receiver charged and paid for accounting time. Woods attempted to argue this

was an "operative fact." The evidence was hearsay, and properly excluded.

Finally, in closing, we make one comment regarding Woods individually. On top of everything else, his undisputed testimony in this case established that he never retained or desired to retain Egler to represent him, as opposed to Corporations. Thus, there was never an attorney-client relationship between Egler and Woods and therefore neither a duty for tort purposes or any type of contractual relationship. On these bases also, Woods' claims as an individual fail.

## In re Amati