**In re Eric J. BLATSTEIN**

**718 Arch Street Associates, Ltd. et al., Plaintiffs,**

**v.**

**Eric J. Blatstein et al., Defendants.**

**No. CIV. A. 00–CV–954.**

United States District Court, E.D. Pennsylvania.

March 19, 2001.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Leslie Beth Baskin, Suzanne Ilene Schiller, Spector, Gadon and Rosen, P.C., Philadelphia, PA, for Eric J. Blatstein.

Steven M. Coren, Kaufman, Coren & Ress, Philadelphia, PA, David Dormont, Kaufman, Coren, Ress and Weidman, Philadelphia, PA, for Michael H. Kaliner, Trustee, 718 Arch Street Associates, and Mitchell Miller, Trustee.

Samuel E. Cohen, Carl Oxholm, III, Kevin J. Carey, Allison M. Berger, Fox Rothschild, O'Brien & Frankel, Philadelphia, PA, for Lori Blatstein.

Paul B. Maschmeyer, Philadelphia, PA, for Main, Inc.

Morris Lift, CPA, Bala Cynwyd, PA, pro se.

Columbusco, Inc., Philadelphia, PA, pro se.

B. Christopher Lee, Jacoby Donner, P.C., Philadelphia, PA, for Delawareco, Inc., Engine 46 Steak House, Inc., Reedco, Inc., Waterfront Management Corp., Airbev, Inc., and Pier 53 North, Inc.

Frederick J. Baker, Philadelphia, PA, United States Trustee.

**Memorandum and Order**

YOHN, District Judge.

Michael H. Kaliner ("Trustee"), the trustee of Eric J. Blatstein's bankruptcy estate, and 718 Arch Street Associates ("Arch Street")[1] appeal from a final order of the bankruptcy court determining that Eric J. Blatstein ("Blatstein") fraudulently transferred $1,533,428.65 to his wife, Lori Blatstein ("Lori"),[2] and entering judgment against Blatstein and in favor of the Trustee for that amount. *See 718 Arch St. Assoc., Ltd. et al. v. Blatstein et al. (In re Blatstein),* 244 B.R. 290 (Bankr.E.D.Pa. 2000) (*"Blatstein V"*). The appellants challenge the bankruptcy court's refusal: 1) to include transfers made prior to October 3, 1995 in the judgment; 2) to include transfers made after Blatstein filed for bankruptcy in the judgment; 3) to enter judgment against Lori; 4) to enter judgment against the Blatsteins jointly and severally; 5) to award prejudgment interest; and 6) to provide for equitable relief.

1. The Trustee and Arch Street will be referred to collectively as the "appellants."

2. Blatstein and Lori will be referred to collectively as the "Blatsteins."

*See* Appeal Br. of Pl./Appellants (Doc. No. 3)("Appeal Br."). After considering the Appeal Brief, the opposition by the Blatsteins, Br. of Appellees (Doc. No. 5)("Blatsteins' Br."), and supplementary filings, I conclude that the bankruptcy court's order should be affirmed in part and vacated in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The litigation involving the Main, Inc. and Blatstein bankruptcy estates has a convoluted history. That history will be repeated here only to the extent that it is necessary to resolve the issues before the court.

On November 12, 1992, Arch Street obtained a confessed judgment in state court against Blatstein in the amount of $2,774,803.09 for breach of a commercial lease. *See 718 Arch St. Assoc., Ltd. et al. v. Blatstein et al. (In re Main, Inc.; In re Blatstein),* 213 B.R. 67, 75 (Bankr.E.D.Pa. 1997) ("*Main II*"). Blatstein filed a personal Chapter 7 proceeding on December 19, 1996,[3] and Michael H. Kaliner was appointed interim trustee. *See id.* at 72. Arch Street brought these adversary proceedings in the bankruptcy court accusing Blatstein of, inter alia, fraudulently transferring his shares in a number of corporations and his income to Lori in order to avoid paying his creditors. *See id.* at 93–95. The Trustee was allowed to intervene in the proceedings.

The bankruptcy court held that Blatstein did not fraudulently transfer his assets to Lori. *See id.* In reaching this decision, the bankruptcy court concluded that the plaintiffs failed to prove that Blatstein transferred assets to Lori, and, even if Blatstein did make such transfers, the plaintiffs failed to prove that he did so with an actual intent to defraud his creditors. *See id.* at 94. On reconsideration, the bankruptcy court also rejected the plaintiffs' "constructive fraud" theory of intent. *See 718 Arch St. Assoc., Ltd. et al. v. Blatstein et al. (In re Main, Inc.; In re Blatstein),* No. 96–19098DAS, 96–31813DAS, 97–0004DAS, 97–0008DAS, 1997 WL 626544, at *5–*6 (Bankr.E.D.Pa. Oct.7, 1997) ("*Main III*"). In rejecting this claim, the bankruptcy court emphasized that the plaintiffs failed to prove that Blatstein did not receive a "reasonably equivalent value" in return for any transfers that he allegedly made to Lori. *See id.* at *6.

On appeal, the district court (prior to the reassignment of this case to me) affirmed the bankruptcy court's refusal to set aside Blatstein's deposit of assets in accounts maintained in his wife's name. *See 718 Arch St. Assoc., Ltd. et al. v. Blatstein et al. (In re Blatstein; In re Main, Inc.),* 226 B.R. 140, 159–60 (E.D.Pa. 1998) ("*Blatstein II*").

The Third Circuit affirmed the district court's order affirming the bankruptcy court's finding that Blatstein did not fraudulently transfer corporate shares to his wife. *See 718 Arch St. Assoc., Ltd. et al. v. Blatstein et al. (In re Blatstein; In re Main, Inc.),* 192 F.3d 88, 96 (3d Cir.1999) ("*Blatstein IV*") However, the Third Circuit reversed the district court's order affirming "the bankruptcy court's conclusions with respect to Blatstein's income transfers to Lori's personal bank accounts." *Id.* at 96–97. First, the Third Circuit concluded that the money Lori received was earned income and not dividends or equity distributions. *See id.* at

3. The bankruptcy court occasionally states that Blatstein filed for bankruptcy on December 16, 1996. *See, e.g., Blatstein V,* 244 B.R. at 294 & 298. This appears to be a typographical error.

97. Second, the Third Circuit held that Blatstein transferred this income with an actual intent to defraud his creditors. *See id.* at 97–99.

On remand, the bankruptcy court addressed basically one legal issue: "the proper remedy when a husband is found to have engaged in actual fraud by conveying his income, all of which has now apparently been spent at his direction, to his wife." *Blatstein V,* 244 B.R. at 292. The bankruptcy court found that Blatstein fraudulently transferred $1,533,428.65 from his bankruptcy estate. *See id.* at 298–300. However, because the bankruptcy court found that Lori was not an "initial transferee," it entered judgment for that amount against Blatstein alone. *See id.* at 301–03.

## STANDARD OF REVIEW

The district court, sitting as an appellate tribunal, applies a clearly erroneous standard to review the bankruptcy court's factual findings and a de novo standard to review its conclusions of law. *See In re Siciliano,* 13 F.3d 748, 750 (3d Cir. 1994). A finding of fact is clearly erroneous if a reviewing court has a "definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (quotation omitted). Mixed questions of fact and law require a mixed standard of review, under which the court reviews findings of historical or narrative fact for clear error but exercises plenary review over the bankruptcy court's "choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3d Cir.1991) (quotation omitted), *cert. denied, Committee of Unsecured Creditors v. Mellon Bank, N.A.,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992); *see Chemetron Corp. v. Jones,* 72 F.3d 341, 345 (3d Cir.1995), *cert. denied,* 517 U.S. 1137, 116 S.Ct. 1424, 134 L.Ed.2d 548 (1996). When reviewing a decision that falls within the bankruptcy court's discretionary authority, the district court may only determine whether or not the lower court abused its discretion. *See In re Top Grade Sausage,* 227 F.3d 123, 125 (3d Cir.2000). "An abuse of discretion exists where the [lower] court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *International Union, UAW v. Mack Trucks, Inc.,* 820 F.2d 91, 95 (3d Cir.1987).

## DISCUSSION

There are two categories of issues involved in this appeal. First, the appellants claim that Blatstein fraudulently transferred more than $3 million to his wife Lori between 1994 and 1997. In particular, the appellants argue that the bankruptcy court erred as a matter of law by only including fraudulent transfers made between October 3, 1995 and December 19, 1996 in the judgment. Second, the appellants contend that the scope of the remedy should be enlarged to ensure that the bankruptcy estate is adequately compensated. Specifically, the appellants claim that the bankruptcy court erred by refusing to enter judgment against Lori or against the Blatsteins jointly and severally, to award prejudgment interest, and to provide for equitable relief.

### I. Fraudulent Transfers

The appellants claim that Blatstein fraudulently transferred $3,080,919.30 to Lori between 1994 and 1997. *See* Appeal Br., at 16. This sum includes $395,365.91 in 1994, $1,222,588.79 in 1995, $806,412.60 in 1996, and $656,552.00 in 1997. *See id.* The appellants argue that the bankruptcy

court erred as a matter of law when it held that Blatstein did not fraudulently transfer income to Lori prior to October 3, 1995. *See id.* at 42–44. The appellants also claim that the bankruptcy court erred as a matter of law by failing to include fraudulent transfers made after December 19, 1996 in the judgment. *See id.* at 44–47. The appellants also ask that the bankruptcy court's factual findings regarding the allegedly fraudulent transfers be overturned to the extent that they are clearly erroneous. *See id.* at 1–2.

The bankruptcy court concluded that Blatstein fraudulently transferred $1,533,428.65 to Lori. *See Blatstein V,* 244 B.R. at 297–300. In reaching this conclusion, the bankruptcy court found that: 1) the Trustee's claims involving fraudulent transfers that allegedly occurred after February 1, 1994 are not barred by the statute of limitations; 2) there is no evidence that Blatstein made any fraudulent transfers prior to October 3, 1995; 3) Blatstein fraudulently transferred $1,533,428.65 into Lori's personal bank accounts between October 3, 1995 and December 19, 1996; and 4) the Trustee is not entitled to recover transfers Blatstein made after Blatstein filed for bankruptcy. *See id.*

A. Statute of Limitations

The bankruptcy court held that the statute of limitations barred claims arising from transfers Blatstein made prior to February 1, 1994. *See id.* at 297. First, the bankruptcy court found that, because this action was filed within two years after the appointment of the Trustee, it satisfied the time-frame imposed by 11 U.S.C. § 546. *See id.* The bankruptcy court also found that, as of the date Blatstein's bankruptcy petition was filed, most of the transfers challenged by the Trustee fell within the four-year statute of limitations imposed by the Pennsylvania Uniform Fraudulent Transfer Act (PUFTA). *See id.* (citing 12 Pa.C.S.A. § 5109(2)). However, despite these findings, the bankruptcy court concluded that the statute of limitations would bar any claims involving transfers that occurred prior to February 1, 1994, the date Pennsylvania effectively adopted PUFTA, because the statute of limitations under the prior state law was only two years. *See id.*

Neither the appellants nor the Blatsteins have challenged this conclusion.[4] As a result, this court notes that the bankruptcy court appropriately concluded that consideration of fraudulent transfers allegedly made before February 1, 1994 was barred by the statute of limitations.

B. Transfers Made Prior to October 3, 1995

Based on its interpretation of *Blatstein IV,* the bankruptcy court found that Blatstein did not fraudulently transfer income to Lori prior to October 3, 1995. *See id.* at 297–98. The bankruptcy court first noted that the Third Circuit "plainly stated that it was ruling only that Blatstein acted with intent to defraud his creditors when he transferred his earned income into Lori's bank accounts." *Id.* at 298 (citing *Blatstein IV,* 192 F.3d at 97). Because the bankruptcy court had already found that "[t]he *only such accounts* were Lori's Mellon PSFS and Gruntal Money Market accounts," and that Lori did not open either

4. In the Blatsteins' Brief, footnote one appears to be inconsistent with footnote three. *See* Blatsteins' Br., at 7 & 17. Because their only mention of the statute of limitations issue is in footnotes that seemingly offer contradictory conclusory statements, I will presume that the Blatsteins did not intend to challenge the bankruptcy court's conclusion on this issue.

of these accounts prior to October 3, 1995, the bankruptcy court concluded that Blatstein did not fraudulently transfer any earned income to Lori prior to October 3, 1995. *See id.* at 297–99.

The appellants claim that the bankruptcy court erred as a matter of law when it limited the Trustee's claim to earned income that Blatstein transferred to Lori and which were deposited into her Mellon PSFS and Gruntal Money Market accounts. *See* Appeal Br., at 43. The appellants argue that what Lori did with the money after it was transferred to her is immaterial to the question of whether it constitutes a fraudulent transfer or not. *See id.* In particular, the appellants claim that the bankruptcy court should have found that Blatstein fraudulently transferred an additional $890,938.65 in earned income to Lori during 1994 and 1995. *See id.* at 16.

■ Whether Blatstein fraudulently transferred income to Lori prior to October 3, 1995 is a mixed question of fact and law. As a result, after interpreting the Third Circuit's decision, I will review the bankruptcy court's findings of fact for clear error and subject its application of the law to those facts to de novo review.

■ Under PUFTA, a

> "transfer made or obligation incurred by a debtor is fraudulent as to a creditor, ... if the debtor made the transfer or incurred the obligation:"
>
> "(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor" was insolvent at the time of the transfer or became insolvent as a result of it.

*Blatstein IV,* 192 F.3d at 96 (quoting 12 Pa.C.S.A. § 5104). In other words, "[t]he first provision provides for liability under an 'actual intent' theory of fraud, while the second is a 'constructive fraud' provision." *Id.*

■ In *Blatstein IV,* the Third Circuit found that "Eric Blatstein fraudulently transferred his income to his wife in an effort to keep the money from his creditors." *Id.* at 92. In reaching this conclusion, the Third Circuit first determined that the income in question was Blatstein's earned income and not distributions of dividends or equity. *See id.* at 97. Thus, the Third Circuit held that the bankruptcy court erred when it found that Blatstein did not transfer his income to Lori. *See id.* Next, the Third Circuit considered whether Blatstein intended to defraud his creditors when he transferred his income to Lori. The Third Circuit determined that the bankruptcy court's finding that Blatstein "deposited his income into Lori's accounts because his credit and reputation with banks was poor, and because he 'was trying to keep the funds from being seized or frozen by the IRS,' " clearly demonstrated that Blatstein intended to defraud one of his creditors by transferring his income to Lori. *Id.* (quoting *Main II,* 213 B.R. at 94). As a result, the Third Circuit concluded that "the bankruptcy court's determination that Blatstein did not have the actual intent to defraud his creditors was erroneous." *Id.* at 98.[5]

In reaching this conclusion, the Third Circuit quoted language from a section of

5. The Third Circuit also noted that "the bankruptcy court erred in its 'constructive fraud' analysis by incorrectly placing on Arch Street the burden of proving that reasonably equivalent value was not given for the transfer.... In fact, if the grantor is in debt at the time of a transfer PUFTA places on the grantee the burden of proving by clear and convincing evidence either that the grantor was solvent at the time of the transfer or that the grantee had given reasonably equivalent value for the conveyance." *Id.*

the original bankruptcy court opinion that addresses Blatstein's motivation for placing "the bank *accounts* and the Gruntal Account in Lori's name only." *Main II,* 213 B.R. at 94 (emphasis added). The bankruptcy court's findings regarding these accounts were discussed in greater detail earlier in the same section of the bankruptcy court's original decision:

> Lori testified at trial that *all of the brokerage and bank accounts* of the Blatsteins are in her name alone, *and have been for the past four years.* As a result, Blatstein deposits his income from his various corporations into these accounts. She testified at trial that the Blatsteins agreed that *all of their accounts* would only be opened in her name because of Blatstein's financial problems resulting from the money he owes to the IRS and not due to Arch's judgment against him, although in a pre-trial deposition she allowed that the Arch judgment was a factor as well.

*Id.* at 93–94 (emphasis added). This finding provided the basis for the Third Circuit's decision. Because Lori's testimony refers to at least one account besides the Mellon PSFS and Gruntal Money Market accounts, and this account was (or these accounts were) apparently open prior to October 3, 1995,[6] her testimony directly contradicts the bankruptcy court's conclusion that the Third Circuit's remand was limited to money deposited in the Mellon PSFS and Gruntal Money Market accounts. As a result, the bankruptcy court erred when it concluded that Blatstein did not fraudulently transfer income to Lori prior to the date on which money was first deposited into Lori's Gruntal Money Market account.

Because the Third Circuit considered all of the money Blatstein transferred to Lori and never specifically limited its remand to funds deposited in the two accounts, the bankruptcy court erred when it concluded that Blatstein did not fraudulently transfer any earned income to Lori prior to October 3, 1995. As a result, I will vacate the bankruptcy court's conclusion that the Third Circuit's reversal only applied to earned income that was deposited into Lori's Mellon PSFS and Gruntal Money Market accounts and remand for findings of fact with reference to any income transferred by Blatstein to Lori between February 1, 1994 to October 3, 1995.

C. Transfers Made Between October 3, 1995 and December 19, 1996

The bankruptcy court found that Blatstein fraudulently transferred $1,533,428.65 into Lori's Mellon PSFS and Gruntal Money Market accounts between October 3, 1995 and December 19, 1996. *See Blatstein V,* 244 B.R. at 298–300. In particular, the bankruptcy court found that Blatstein made eight deposits totaling $15,478.26 into the Mellon PSFS account and twelve deposits totaling $711,537.79 into the Gruntal Money Market account during 1995. *See id.* at 299. The bankruptcy court also found that, during 1996, Blatstein made thirty-three deposits into each account totaling $174,192.73 and $632,219.87 respectively. *See id.* As a result, the bankruptcy court found that Blatstein fraudulently conveyed $1,533,428.65 to Lori between October 3, 1995 and December 19, 1996. *See id.* at 300.

On appeal, the Trustee has not challenged the bankruptcy court's finding that Blatstein transferred $1,533,428.56 to

6. In their brief, the appellants note that the Blatsteins "produced no personal financial records other than tax returns prior to October, 1995, so the Trustee does not know exactly how the Blatsteins did their banking...." Appeal Br., at 43 n. 27.

Lori's Mellon PSFS and Gruntal Money Market accounts. However, the Blatsteins claim that the bankruptcy court erred when it entered judgment against Blatstein in the amount of $1,533,428.65 because "only $315,437.37 in [W-2 wages] was transferred into the Mellon PSFS and Gruntal Money Market accounts." Blatsteins' Br., at 1. The Blatsteins base their argument on the assertion that the Third Circuit "held that only Eric Blatstien's [sic] paychecks or 'earned income' deposited into accounts titled in Lori's name were to be avoided as fraudulent transfers," and that the bankruptcy court "failed to limit its consideration to what is considered 'earned income' as required by the Court of Appeals' mandate." *Id.* at 18.

The Trustee, however, has questioned whether there is a cross appeal currently pending before this court. *See* Supplemental Appeal Br. of Pl./Appellants Michael H. Kaliner, Esq., Trustee of the Eric J. Blatstein Bankruptcy Estate and 718 Arch Street Associates, Ltd. (Doc. No. 8)("Supplemental Appeal Br."), at 9. Referring to an order filed under docket number 00–CV–1089, *see* Order of October 13, 2000 (00–CV–1089, Doc. No. 3), the Trustee claims that "[t]his Court dismissed Eric Blatstein's cross appeal on October 13, 2000...." *Id.* In response, the Blatsteins claim that order of October 13, 2000 dismissed an appeal that was jointly filed by Eric and Lori Blatstein but that a separate appeal that was filed by Eric Blatstein on March 14, 2000 is still pending before this court. *See* Letter from Attorney Berger to Chambers of 2/9/01 ("Blatsteins' Supplemental Br."), at 6–7.

On February 9, 2000, the Blatsteins filed a notice of appeal that the Clerk docketed as Civil Action 00–CV–1089. *See* Certificate of Appeal of Lori J. Blatstein and Eric J. Blatstein (00–CV–1089, Doc. No. 1). On February 29, the Clerk issued a briefing schedule for Civil Action 00–CV–1089. *See* Briefing Schedule (00–CV–1089, Doc. No. 2). Because the scheduling order for Civil Action 00–CV–1089 was not complied with, this court dismissed the Blatsteins' appeal on October 13, 2000. *See* Order of October 13, 2000 (00–CV–1089, Doc. No. 3). This order was never appealed and is final.

On February 7, 2000, the Trustee filed a notice of appeal that the Clerk docketed as Civil Action No. 00–CV–954. *See* Certificate of Appeal of Trustee Michael H. Kaliner and 718 Arch Street Associates (Doc. No. 1)("Certificate of Appeal"). On March 14, 2000, Eric J. Blatstein filed a statement of issue on cross appeal. *See* Statement of Issue on Cross–Appeal (Doc. No. 4). However, this statement of issue on cross appeal is inadequate to present a cross appeal because it was untimely. Bankruptcy Rule 8002(a) states that a party must file a notice of appeal within ten days of the date on which the other party has filed a notice of appeal. *See* Bankr.R. 8002(a)("If a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 10 days of the date on which the first notice of appeal was filed...."). As noted above, the Trustee filed a timely notice of appeal on February 7, 2000 and Blatstein's attempt to file a cross appeal was not made until March 14, 2000. Because the ten day mandate of Rule 8002(a) is jurisdictional in effect, *see Frymire v. PaineWebber, Inc.,* 107 B.R. 506, 514 (E.D.Pa.1989)(citing *In re Universal Minerals, Inc.,* 755 F.2d 309, 311–12 (3d Cir.1985)), Blatstein's failure to file a timely notice of cross appeal deprives this court of jurisdiction to review the bankruptcy court's judgment against him.

Even if Blatstein's statement of issue on cross appeal had been timely filed, there would still not be a cross appeal before this court because Blatstein failed

to file a notice of cross appeal. Under Bankruptcy Rule 8006, the filing of a notice a cross appeal is a prerequisite for the filing of a counter statement of issues on cross appeal and, as a result, a counter statement of issues cannot be substituted for a filing of a notice of cross appeal. *See* Bankr.R. 8006 ("[I]f the appellee has filed a cross appeal, the appellee as cross appellant shall file and serve a statement of issues to be presented on cross appeal...."); *Frymire,* 107 B.R. at 514. Because Blatstein never filed a notice of cross appeal, there is currently no cross appeal pending before this court.

Moreover, even if there were a cross appeal before this court, I would affirm the bankruptcy court's finding that Blatstein fraudulently transferred $1,533,428.65 to Lori between October 3, 1995 and December 19, 1996. Determining the amount of money Blatstein fraudulently transferred between October 3, 1995 and December 19, 1996 requires the resolution of a mixed question of fact and law. As a result, I will review the bankruptcy court's findings of fact for clear error and subject its application of the law to those facts to de novo review.

As noted above, before reaching the conclusion that "Blatstein fraudulently transferred his income to his wife in an effort to keep the money from his creditors," *Blatstein IV,* 192 F.3d at 92, the Third Circuit first determined that the income in question was Blatstein's earned income and not distributions of dividends or equity. *See id.* at 97. The Third Circuit used the term "earned income" to refer to a wide variety of money Blatstein received from various corporations. Although the Third Circuit did not explicitly define the term, within the context of its opinion, it is clear that "earned income" broadly refers to payments that were made to Blatstein by any of the corporations with which he was involved. *See id.* Therefore, when the bankruptcy court refused to limit its inquiry to Blatstein's W-2 wages and concluded that $1,533,428.65 of Blatstein's income was deposited into Lori's Mellon PSFS and Gruntal Money Market accounts, it correctly interpreted the scope of the Third Circuit's use of the term "earned income." As a result, the bankruptcy court did not err as a matter of law when it found that Blatstein fraudulently transferred $1,533,428.65 to Lori between October 3, 1995 and December 19, 1996.

Before concluding that Blatstein fraudulently transferred $1,533,428.65 to Lori between October 3, 1995 and December 19, 1996, the bankruptcy court carefully analyzed the pertinent records. *See Blatstein V,* 244 B.R. at 299. The bankruptcy court found that "the Trustee's brief offered grossly inflated numbers," including transfers that had already been discarded by the *Main X* opinion and others of which "were not reflective of any type of transfer." *Id.* at 298-99. Similarly, the bankruptcy court found that the Blatsteins' "present[ed] highly deflated numbers" and "fail[ed] to show all of the actual transactions at issue." *Id.* at 299. After analyzing the evidence submitted by both parties, the bankruptcy court found that Blatstein transferred $1,533,428.65 into Lori's Mellon PSFS and Gruntal Money Market accounts between October 3, 1995 and December 19, 1996. *See id.* at 299-300.

Keeping in mind the broad scope of the of the term "earned income" as the Third Circuit employed it, I have reviewed the relevant exhibits and the bankruptcy court's findings regarding the fraudulent transfers. *See* Certificate of Appeal, Ex. E (Pl.'s Ex. 100: Gruntal Money Market Register from 10/3/95 to 12/3/96), Ex. G (Pl.'s Ex. 102: Mellon PSFS Register from 11/22/95 to 3/29/96), Ex. I (Pl.'s Ex. 103:

Mellon PSFS Register from 3/29/96 to 6/28/96), Ex. K (Pl.'s Ex. 104: Mellon PSFS Register from 7/1/96 to 9/18/96), and Ex. L (Pl.'s Ex. 105: Mellon PSFS Register from 9/20/96 to 1/31/97). Because I do not have a "definite and firm conviction" that the bankruptcy court has committed a mistake, if there were a cross appeal before this court I would not conclude that the bankruptcy court's finding that Blatstein fraudulently transferred $1,533,428.65 to Lori was clearly erroneous.[7] Thus, even if there were a cross appeal before this court, I would affirm the bankruptcy court's conclusion that Blatstein fraudulently transferred $1,533,428.65 to Lori between October 3, 1995 and December 19, 1996.

D. Transfers Made After December 19, 1996

The bankruptcy court also concluded that the Trustee is not entitled to recover the postpetition income Blatstein transferred to Lori. *See Blatstein V,* 244 B.R. at 298. In reaching this conclusion, the bankruptcy court first found that Blatstein's postpetition earnings are not property of the bankruptcy estate. *See id.* (citing 11 U.S.C. §§ 541(a)(1), (a)(6)); 5 Collier on Bankruptcy, ¶ 541.17, at 541–67 (15th ed. rev.1999). The bankruptcy court also found that the Trustee is not a creditor under PUFTA, and that "the Trustee's power to invoke PUFTA under 11 U.S.C. § 544 is limited, by § 544(a), to the rights of hypothetical creditors 'as of the commencement of the case.'" *Id.* As a result, the court concluded that postpetition transfers in violation of PUFTA could not be reached by the Trustee. *See id.*

As the bankruptcy court correctly noted, Blatstein's postpetition earnings are not the property of his bankruptcy estate, *see* 11 U.S.C. § 541; 5 Collier on Bankruptcy § 541.03 & 541.17 (15th rev. ed.2000), and the Trustee's strong-arm power under § 544(a) only applies to prepetition transfers. *See, e.g., Farmer v. Autorics, Inc. (In re Branam),* 247 B.R. 440, 444 (Bankr.E.D.Tenn.2000); *Hirsch v. Pennsylvania Textile Corp., Inc. (In re Centennial Textiles, Inc.),* 227 B.R. 606, 610 (Bankr.S.D.N.Y.1998); *Burtch v. Hydraquip, Inc. (In re Mushroom Transp. Co., Inc.),* 227 B.R. 244, 259–60 (Bankr. E.D.Pa.1998); *Meininger v. Harp et al. (In re Stoops),* 209 B.R. 1, 3 (Bankr. M.D.Fla.1997); *Eisenberg v. Bank of New York (In re Sattler's, Inc.),* 73 B.R. 780, 790–91 (Bankr.S.D.N.Y.1987); *but see Murray v. Guillot et al. (In re Guillot),* 250 B.R. 570, 601–02 (Bankr.M.D.La.2000) ("We differ from the courts who relegate § 544(a) to pre-petition transfers ....") (citing David Gray Carlson, Bankruptcy's Organizing Principle, 26 Fla. St. U.L.Rev. 549, 568 n. 75 (1999)). Although they apparently concede these points, the appellants still claim that the bankruptcy court erred as a matter of law when it held that they were not entitled to a judgment for Blatstein's fraudulent postpetition transfers. *See* Appeal Br., at 44–47. The appellants argue that they were entitled to a judgment for this additional amount because: 1) the Trustee is a creditor of Blatstein who has been defrauded by the postpetition transfers; 2) return of these funds is necessary to avoid a race between the Trustee and Blatstein's individual credi-

7. I will note that the electronic version of the bankruptcy court's opinion contains a typographical entry in Table 9: $10,441.66, not $510,441.66, was deposited into the Gruntal Money Market account on October 28, 1996. *See id.* at 299; Plaintiff's Exhibit 100. However, this typographical error does not appear in the bankruptcy court's original opinion. *See* Certificate of Appeal, Copy of Opinion and Order of the Honorable David A. Scholl dated January 21, 2000 and entered on February 3, 2000, Table 9, at 23.

tors who are no longer barred by the section 362(a) stay; and 3) Blatstein's postpetition transfers defrauded, hindered and delayed Arch Street, a creditor, from obtaining a judgment. *See* Appeal Br., at 44. In particular, the appellants claim that the bankruptcy court should have found that Blatstein fraudulently transferred an additional $656,552.00 during 1997. *See id.* at 16. I will examine the appellants' arguments, applying a de novo standard to review the bankruptcy court's conclusions of law.

Under PUFTA, a creditor is empowered to bring an action to have a fraudulent transfer set aside. *See* 12 Pa. C.S.A. § 5104. The appellants claim that the Trustee is a creditor, and, therefore, PUFTA entitles him to pursue and recover Blatstein's postpetition fraudulent transfers. *See* Appeal Br., at 44–45.

Under PUFTA, a "creditor" is "[a] person who has a claim," 12 Pa.C.S.A. § 5101(b)(3), and a "claim" is defined "[a] right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." *Id.* As the bankruptcy court noted, the Trustee does not presently have any "right to payment" under PUFTA. *See Blatstein V,* 244 B.R. at 298. Instead, "[m]uch like a public official has certain powers upon taking office as a means to carry out the functions bestowed by virtue of the office or public trust, the [trustee] is similarly endowed to bring certain claims on behalf of, and for the benefit of, all creditors." *Official Committee of Unsecured Creditors v. Chinery et al. (In re Cybergenics Corp.),* 226 F.3d 237, 244 (3d Cir.2000). In other words, the power to avoid fraudulent transfers is not a personal asset of the Trustee. *See id.* Because the Trustee does not have a "claim" under PUFTA, he does not have standing as a "creditor" under 12 Pa.C.S.A. § 5104. Therefore, the Trustee is not entitled to pursue Blatstein's postpetition transfers in this forum.

The appellants also argue that "the interests of justice require an orderly way for the Trustee to recover Blatstein's [postpetition] fraudulently transferred assets for the benefit of Blatstein's creditors and to avoid a race between the Trustee and the creditors he represents." Appeal Br., at 46. The appellants do not cite a single case in support of this novel argument. As noted above, the Trustee is not currently entitled to pursue Blatstein's postpetition transfers under either the bankruptcy code or PUFTA. As a result, in this proceeding the Trustee cannot recover the assets Blatstein earned and fraudulently transferred after filing for bankruptcy.

Finally, the appellants claim that Blatstein's postpetition transfers defrauded, hindered and delayed Arch Street, a creditor, from obtaining a judgment. *See id.* at 45–46. The appellants point out that the bankruptcy court's opinion does not address whether Arch Street, "as a plaintiff and creditor of Blatstein," should have been granted relief. *See id.* at 22. As a result, there are no findings to review. However, given that Arch Street did not submit a brief to the bankruptcy court, it appears that the bankruptcy court did not address this claim because the appellants failed to raise it. For this reason, the Blatsteins argue that Arch Street "no longer has standing as a party and has no right to prosecute a fraudulent transfer action." Blatsteins' Br., at 1.

"As a general rule, a court should refuse to consider an issue that is raised for the first time on appeal." *Hutchins v. Commonwealth Mortgage Corp.,* 165 B.R. 401, 405 (E.D.Pa.1994) (citing *Singleton v. Wulff,* 428 U.S. 106, 121,

96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Salvation Army v. New Jersey Dept. of Cmty. Affairs,* 919 F.2d 183, 196 (3d Cir.1990)). Although "there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, or where 'injustice might otherwise result,'" *Salvation Army,* 919 F.2d at 196 (citations omitted), the appellants have not shown that this issue falls within this narrow group of exceptions to the general rule. *See In re Middle Atl. Stud Welding Co.,* 503 F.2d 1133, 1134 n. 1 (3d Cir.1974) (approving district court's refusal to entertain arguments not raised before bankruptcy referee); *see also United States v. Williams,* 156 B.R. 77, 81 (S.D.Ala.1993) ("This court's function on appeal from a Bankruptcy Court's determination is to reverse, affirm, or modify only those issues that were presented to the trial judge."). As a result, I will not address the merits of the appellants' new claim.

For the above reasons, I will affirm the bankruptcy court's conclusion that the Trustee cannot recover Blatstein's postpetition fraudulent transfers.

II. Scope of the Remedy

The appellants contend that the scope of the remedy should be enlarged to ensure that the bankruptcy estate is adequately compensated. Specifically, the appellants claim that the bankruptcy court erred as a matter of law by refusing to enter judgment against Lori or against the Blatsteins jointly and severally, to award prejudgment interest, and to provide for equitable relief. *See* Appeal Br., at 30–42, 47–50. The appellants also ask that, to the extent the bankruptcy court made incorrect factual findings in deciding what the appropriate remedies should be, the bankruptcy court's factual findings should be overturned. *See id.* at 1–2.

The bankruptcy court stated that the "one legal issue" which its opinion would address was: "the proper remedy when a husband is found to have engaged in actual fraud by conveying his income, all of which has now apparently been spent at his direction, to his wife." *Blatstein V,* 244 B.R. at 292. The bankruptcy court concluded that Blatstein is liable for the $1,533,428.65 he fraudulently transferred to Lori between October 3, 1995 and December 19, 1996. *See id.* at 293. In reaching this decision, the bankruptcy court concluded that: 1) Lori is not liable because she did not have "dominion" over the money that was deposited into her PSFS Mellon and Gruntal Money Market accounts; 2) "equity and justice" did not require that the judgment be entered against the Blatsteins jointly and severally; 3) the Trustee was not entitled to collect prejudgment interest; and 4) the Trustee was not entitled to equitable relief to ensure that he would be able to collect the judgment from Blatstein. *See id.* at 300–04.

A. Liability for the Fraudulent Transfers

The bankruptcy court concluded, that, "in the instant circumstances, where the wife has not been found to engage in any fraud, the only appropriate remedy is a judgment against the husband for the amount conveyed, as opposed to a judgment against the wife or against the husband/wife entireties entity, jointly and severally, for this amount." *Id.* at 292–93.

1) Blatstein's Liability

The bankruptcy court concluded that the Trustee was entitled to a judgment against Blatstein for the amount of money he fraudulently transferred to Lori. *See id.* at 293. The Blatsteins conceded this point before the bankruptcy court, and the Trustee has not challenged this conclusion

on appeal. As a result, this court notes that the bankruptcy court appropriately concluded that the Trustee is entitled to a judgment against Blatstein for the amount of money the bankruptcy court found Blatstein fraudulently transferred to Lori.

2) Lori's Liability

Because the bankruptcy court found that Lori lacked "dominion" over the money Blatstein fraudulently transferred to her, it concluded that Lori was not an "initial transferee." *See id.* at 301–03. As a result, the bankruptcy court held the Trustee was not entitled to a judgment against Lori for the amount of money the bankruptcy court found Blatstein fraudulently transferred to her. *See id.* at 303.

The appellants claim that, because the Third Circuit found that " 'Eric Blatstein fraudulently transferred his income *to his wife* in an effort to keep the money from his creditors,' " Lori Blatstein is an initial transferee as a matter of law, and, under the law of the case doctrine, the bankruptcy court was not free to find otherwise. Appeal Br., at 30–31 (quoting *Blatstein IV,* 192 F.3d at 90 (emphasis added)). In the alternative, the appellants assert that the bankruptcy court erred when it found that Lori did not have dominion and control over the fraudulently transferred funds, and, as a result, the bankruptcy court should have concluded that Lori was an initial transferee. *See id.* at 36. In the particular, the appellants argue that Lori should be found to be an initial transferee because she had physical control and legal authority over the fraudulently transferred funds, and she used the funds to buy, inter alia, stocks and household items. *See id.* at 31.

The bankruptcy court correctly noted that "Section 550(a) of the [Bankruptcy] Code governs a trustee's recovery of a fraudulent conveyance." *Blatstein V,* 244 B.R. at 301. Section 550(a) provides that:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

"The term 'initial transferee' is not defined in the Bankruptcy Code. However, in *Bonded Fin. Serv., Inc. v. European Am. Bank,* 838 F.2d 890 (7th Cir.1988) [('*Bonded*')], the Seventh Circuit set forth the definition of 'initial transferee' employed by every circuit that has subsequently considered the question." *Bowers v. Atlanta Motor Speedway, Inc. (In re Southeast Hotel Properties, Ltd. P'ship),* 99 F.3d 151, 154 (4th Cir.1996) (citations omitted)("*Bowers*"). As the bankruptcy court noted, the Seventh Circuit held that "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the *right* to put the money to one's own purposes." *Bonded,* 838 F.2d at 893 (emphasis added). And, "courts have consistently held that the *Bonded* dominion and control test is the appropriate test to apply when determining whether a person or entity constitutes an initial transferee under § 550 ...." *Bowers,* 99 F.3d at 155.

i) Law of the Case

The appellants claim that Lori Blatstein is an initial transferee as a matter of law because the Third Circuit found that " 'Eric Blatstein fraudulently transferred his income *to his wife* in an effort to keep

the money from his creditors.' " Appeal Br., at 30 (quoting *Blatstein IV,* 192 F.3d at 90 (emphasis added)). As a result, the appellants assert that, under the law of the case doctrine, the bankruptcy court was bound to find that Lori was an initial transferee. *See id.* at 30–31.

The doctrine of law of the case dictates that "when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the litigation." *Devex Corp. et al. v. General Motors Corp.,* 857 F.2d 197, 199 (3d Cir.1988) (citation omitted). The doctrine only applies "to issues expressly decided by a court in prior rulings and to issues decided by necessary implication." *Bolden v. Southeastern Pennsylvania Transp. Auth.,* 21 F.3d 29, 31 (3d Cir. 1994). As a result, the threshold question is whether the Third Circuit decided that Lori was an initial transferee. *See, e.g., Koppers Co., Inc. v. Certain Underwriters at Lloyd's, London,* 993 F.Supp. 358, 364 (W.D.Pa.1998) ("The law of the case doctrine applies only to issues actually addressed and decided at a previous stage of the litigation."). I will examine the appellant's argument, applying a de novo standard to review the bankruptcy court's conclusion of law.

As the bankruptcy court noted, neither the Bankruptcy Code nor its legislative history define the term "initial transferee." *See Blatstein V,* 244 B.R. at 302 (citing *Bonded,* 838 F.2d at 893). As a result, courts have been forced to fashion an approach that "is consistent with the equitable concepts underlying bankruptcy law." *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),* 848 F.2d 1196, 1199 (11th Cir.1988). While the appellants apparently urge the court to adopt a common sense definition of "transferee," the Seventh Circuit has stated, and other circuits have agreed, that, as it is used in § 550, " '[t]ransferee' is not a self-defining term; it must mean something different from 'possessor' or 'holder' or 'agent.' " *Bonded,* 838 F.2d at 894; *see Christy v. Alexander & Alexander of New York, Inc. (In re Finley et al.),* 130 F.3d 52, 56 (2d Cir.1997) ("We think the wording of Section 550(a) is not so plain as to compel, or persuasively argue for, the principle that every conduit is an initial transferee. The statutory term is 'transferee'—not 'recipient'—and is not self-defining. Numerous courts have recognized the distinction between the initial recipient—that is, the first entity to touch the disputed funds—and the initial transferee under section 550.") (citations omitted). Given this void, courts have generally concurred that "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Bonded,* 838 F.2d at 893.

In *Blatstein IV,* the Third Circuit concluded that "Blatstein fraudulently transferred his income to his wife in an effort to keep the money from his creditors." *Blatstein IV,* 192 F.3d at 92. However, in reaching this conclusion, the Third Circuit did not decide, either expressly or by necessary implication, whether Lori was an initial transferee. The closest the Third Circuit came to discussing whether Lori had dominion over the fraudulently transferred sums was in a section of the opinion that the Third Circuit announced was "not necessary for our result," *id.* at 98, and, therefore, it is dicta. While noting that the bankruptcy court erred in its "constructive fraud" analysis, the Third Circuit commented on the fact that

> by failing to place the burden on Lori to prove that she gave reasonable consideration, the [bankruptcy] court did not adopt the more plausible interpretation of the facts: that Blatstein retained control over the funds despite transferring

> them to his wife. Lori Blatstein used the funds both for her benefit and that of her husband for such purposes as paying their joint debts and putting aside money for their children's college educations. These payments suggest that Blatstein's conveyances were in title only, and that instead of giving her husband consideration in the form of payment of his debts, Lori merely was using the money where Blatstein directed her to use it.

*Blatstein IV,* 192 F.3d at 98. Although the Third Circuit's dicta addresses factual issues that may appear to be relevant to the question of whether Lori was an initial transferee, the Third Circuit did not decide, either expressly or by necessary implication, that Lori was an initial transferee. Therefore, the law of the case doctrine is not applicable to the current proceeding. As a result, the bankruptcy did not err when it refused to find that Lori was an initial transferee as a matter of law.

ii) Dominion and Control

The appellants also claim that the bankruptcy court erred when it found that Lori did not have "dominion and control" over the fraudulently transferred funds because the record contains ample evidence that she had physical control and legal authority over the fraudulently transferred funds. *See* Appeal Br., at 31. As a result, the appellants claim that the bankruptcy court erred when it concluded that the Trustee was not entitled to a judgment against Lori because she was not an initial transferee.

The bankruptcy court concluded that Lori was not an initial transferee because it found that she "lacked 'dominion' over the monies in question." *Blatstein V,* 244 B.R. at 303. In reaching this conclusion, the bankruptcy court relied on its findings that "Lori was merely a pawn who used the monies deposited into her accounts where Blatstein directed her to do so," and that "Blatstein retained control over the monies despite nominally transferring them to Lori." *Id.* The bankruptcy court noted that, at least within the context of a "constructive fraud" inquiry, the Third Circuit stated that it would be a "plausible interpretation of the facts" for the bankruptcy court to find:

> "*that Blatstein retained control over the funds despite transferring them to his wife.* Lori ... used the funds both for her benefit and that of her husband for such purposes as paying their joint debts and putting aside money for their children's college educations. These payments suggest that Blatstein's conveyances were *in title only,* and that instead of giving her husband consideration in the form of payment of his debts, Lori merely was using the money where Blatstein *directed her* to use it."

*Id.* at 302 (quoting *Blatstein IV,* 192 F.3d at 98 (emphasis added)).

Whether the Trustee is entitled to a judgment against Lori for the amount of money the bankruptcy court found Blatstein fraudulently transferred to Lori is a mixed question of fact and law. As a result, after discussing the dominion and control test, I will review the bankruptcy court's findings of fact for clear error and subject its application of the law to those facts to de novo review.

"While courts have consistently held that the *Bonded* dominion and control test is the appropriate test to apply when determining whether a person or entity constitutes an initial transferee under § 550, those same courts have disagreed about the type of dominion and control that must be asserted." *Bowers,* 99 F.3d at 155. While "some courts have held that a principal or agent acting in his or her representative capacity is an initial transferee

where that person exercised physical control over the funds," most courts require more than mere physical dominion or de facto control over the fraudulently transferred funds. *Id.* (citations omitted). For example, some "courts have required the principal or agent to have *legal* dominion and control over the funds transferred in order to constitute the initial transferee of the funds." *Id.* (citations omitted). These courts have held that the dominion and control test requires that the initial transferee have "the right to put those funds to one's own purpose." *Id.* at 156 (quotation omitted).

In choosing a standard to assess whether Lori had "dominion and control," the bankruptcy court sided with the courts that require an entity or an individual to have legal dominion over funds in order to be considered an initial transferee. In particular, the bankruptcy court concluded that, "[a]n entity does not have 'dominion over the money' until it is, in essence, 'free to invest the whole [amount] in lottery tickets or uranium stocks.'" *Blatstein V,* 244 B.R. at 303 (quoting *Bonded,* 838 F.2d at 894). As the bankruptcy court noted, the *Bonded* court also states the standard as follows: "'the minimum requirement of status as a "transferee" is dominion over the money or other asset, the *right* to put the money to one's own purposes.'" *Id.* at 302 (quoting *Bonded,* 838 F.2d at 893) (emphasis added).

Although the bankruptcy court did not err by choosing this high standard for assessing whether Lori had dominion over the fraudulently transferred funds, the bankruptcy did err by ignoring the considerable evidence in the record that Lori clearly had the *right* to put the transferred funds to her own purpose. As a result, even under the high standard employed by the bankruptcy court, Lori had dominion and control over the fraudulently transferred funds. First, it is undisputed that the accounts in question were in Lori's name. *See* L. Blatstein Test., Tr. of May 9, 1997, at 21 & 23. By definition, a person has the right to put money that is in an account titled solely in his or her own name to his or her own purpose. Second, the bankruptcy court has seemingly confused the question of whether one may or may not have *exercised* control over fraudulently transferred funds with the clearly distinct question of whether one had the *right* to exercise control over fraudulently transferred funds. Even if the bankruptcy court's finding that "Lori was merely a pawn who used the monies deposited into her accounts where Blatstein directed her to do so" is empirically correct, ultimately, at every moment after the fraudulent transfers took place, Lori always possessed the right—whether she exercised it or not—to decline to follow Blatstein's instructions. Both Lori's and Blatstein's testimony is clear on this point. For example, Lori testified as follows:

Q. Well, did you treat whatever was in that Gruntal money market account as your own money?

A. It was *my money.* It was our money.

L. Blatstein Test., Tr. of May 9, 1997, at 46 (emphasis added).

Q. Well, who decides if and when you're gonna take some money and give it back to one of these companies that lent it to you?

A. My husband.

Q. Your husband makes that decision?

A. (No verbal response).

Q. Is that a yes?

A. Excuse me?

Q. Your husband makes the decision as to if and when you're gonna take money and pay it back to one of these companies?

A. *Well, we do. Because it's coming out of my account.*

L. Blatstein Test., Tr. of May 9, 1997, at 56 (emphasis added).

And Blatstein concurred with Lori on this point:

Q. If I were to ask you—if I were to pick out the dates as we go down this exhibit and ask you, whose money is in the account at various points in time, could you answer that question any more thoroughly than you've answered it so far, sir?

A. *It's Lori's account, it's Lori's money.*

Q. So it's always Lori's money. It doesn't belong to the companies?

A. *It's her account, it's her money.*

Q. I thought you said a few minutes ago that sometimes it belongs to some of the companies.

A. I never said that.

Mr. Carey: That was not the testimony.

The Court: It was something like that. All right, I don't know.

Mr. Carey: The testimony, your Honor, was that the money went to various—

The Court: It wasn't that it was Lori's. I know that.

The Witness: *The money is in Lori's account, it's Lori's, however, she used it, at times, to pay some expenses.*

Q. Whose expenses?

A. Different company expenses where she put the money back into the companies.

Q. So it's Lori's money unless and until Lori decides she's going to use it to pay the expenses of these companies. Is that your testimony, sir?

A. Lori's account—I'm sorry. Did someone say something?

Q. No, sir.

A. *Lori's account is Lori's money.*

Blatstein Test., Tr. of May 12, 1997, at 140–41 (emphasis added). Third, it is irrelevant whether, by following Blatstein's instructions, Lori was or was not exercising her right to assert dominion over the fraudulently transferred funds. As the appellants pointed out, Lori used the fraudulently transferred funds to purchase, inter alia, "three horses valued at thousands of dollars each, a horse trailer, a double Viking brand stove, art and many pieces of household furniture as well as more than thirty different stocks." Appeal Br., at 9 (citing L. Blatstein Test., Tr. of May 9, 1997, at 50–51 & 66–69). In order to determine whether, in making these purchases, Lori was exercising "dominion and control" over the fraudulently transferred funds, a court would have to analyze Lori's motivations and desires. Questions of this sort are beyond the scope of the "dominion and control" test. Instead, the "dominion and control" test is purely concerned with rights. *See Bonded,* 838 F.2d at 893 ("the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the *right* to put the money to one's own purposes.") (emphasis added). And Lori clearly had the right to invest the fraudulently transferred funds in "lottery tickets or uranium stocks." Whether she chose to exercise that right is irrelevant.

To the extent that the bankruptcy court's determination that Lori did not have dominion and control over the fraudulently transferred funds was based on factual findings, that determination is clearly erroneous, and, to the extent that that determination was based on a legal conclusion, it is an error of law. As a result, the bankruptcy court erred when it concluded that Lori was not an initial transferee and, therefore, that the Trustee

was not entitled to a judgment against her. Thus, I will vacate the bankruptcy court's conclusion that Lori was not an initial transferee and remand for findings of fact and conclusions of law consistent with this opinion.

B. Joint and Several Liability

After finding that Lori was not an active participant in the fraudulent transfers, *Blatstein V,* 244 B.R. at 303, the bankruptcy court concluded that the Trustee was not entitled to a joint and several judgment against the Blatsteins. In reaching this conclusion, the bankruptcy court emphasized that "the trustee failed to cite any authority which, as a special penalty for the fraud and to render a judgement more easily collectible, would impose joint and several liability *on an innocent nominal transferee simply because she was an instrument of the fraud.*" *Blatstein V,* 244 B.R. at 303 (emphasis added). The bankruptcy court also rested this conclusion on its finding that the transaction at issue was not a classic fraudulent conveyance because it entailed transferring funds "from one possibly judgment-proof person (Blatstein) to another (Lori)." *Id.* at 304. Furthermore, the bankruptcy court explained that "[w]e perceive no equity in allowing the Trustee to, without supporting authority, artificially utilize these transactions to obtain a windfall which they would not otherwise support." *Id.*

In support of the bankruptcy court's decision, the Blatsteins claim that "[t]he only other courts found to have specifically considered this issue have come to [the same conclusion that the bankruptcy court did]." Blatsteins' Supplemental Br., at 2. In *In re Cardon Realty Corp.,* the bankruptcy court refused to impose joint and several liability despite finding that transfers between the husband and wife were fraudulent because the "Plaintiff has not provided and the Court has not found any authority for such relief on these causes of action." *Bucki v. Singleton (In re Cardon Realty Corp.),* 146 B.R. 72, 81 (Bankr. W.D.N.Y.1992). Similarly, in *Shamis v. Ambassador Factors Corp.,* the court refused to impose joint and several liability on the parties to a fraudulent transfer because "there is a dearth of legal support for the imposition of joint and several liability between transferors and transferees in a fraudulent conveyance." *Shamis v. Ambassador Factors Corp.,* 95 CIV. 9818 RWS, 2001 WL 25720, at *8 (W.D.N.Y. Jan.10, 2001). However, it should be noted that the *Shamis* court cites *Blatstein V* as support for this claim. *See id.*

The Trustee claims that "[e]quity and justice require a joint and several judgment here, since the Blatsteins, when not placing money into Lori's name alone, titled their significant holdings as tenants by the entireties." Appeal Br., at 38. In particular, the appellants argue that "[a]s a remedial statute which explicitly authorizes numerous equitable remedies for wronged parties, *see* 12 Pa.C.S.A. § 5107(a), the PUFTA should not be interpreted to allow two wrongdoers to escape liability for the same underlying conduct merely because their assets are titled as joint property by the entireties." *Id.*

In support of this argument, the Trustee cites two recent bankruptcy court decisions in which the transferor and transferee were husband and wife. *See* Supplemental Appeal Br., at 2. In *In re Nam,* the debtor husband deposited seven paychecks totaling $7,496.91 into his wife's bank account and the bankruptcy court found that these transfers were both actually and constructively fraudulent under the PUFTA. *See Krasny v. Nam (In re Nam),* 257 B.R. 749, 765–68 (Bankr.E.D.2000). As a result, the bankruptcy court entered judgment against the husband and the wife.

*See id.* However, the Trustee's emphasis on this case seems to be somewhat misplaced because the bankruptcy court did not explicitly find the husband and wife jointly and severally liable. Although the court in *In re McLaren* did find the husband and wife jointly and severally liable, the court only explained its grounds for finding both the husband and the wife liable, not for finding them jointly and severally liable. *Kaler v. McLaren (In re McLaren),* 236 B.R. 882 (Bankr.D.N.D. 1999). As a result, neither of these cases is of much assistance to this court.

More persuasive is the Trustee's argument that this case is analogous to a tort case and that the Blatsteins should be considered to be joint tortfeasors. *See* Supplemental Appeal Br., at 5. This analogy is compelling for two reasons. First, "[a] number of courts have classified fraudulent conveyance claims as torts for purposes of choice-of-law issues." *SEC v. The Infinity Group Co.,* 27 F.Supp.2d 559, 564 (E.D.Pa.1998) (citations omitted). Second, common law fraud is a tort. *See Zimmer v. Gruntal & Co., Inc.,* 732 F.Supp. 1330, 1335–36 (W.D.Pa.1989); *see also Restatement (2d) of Torts* § 525 (1976) ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.").

Under Pennsylvania law, parties whose actions cause a single injury are joint tortfeasors. *See Baker v. AC&S, Inc.,* 729 A.2d 1140, 1146 (Pa.Super.Ct.1999)("Under Pennsylvania law, it is well-established that if the tortious conduct of two or more persons combines to cause a single harm which cannot be apportioned, the actors are joint tortfeasors even though they may have acted independently."), *aff'd,* 562 Pa. 290, 755 A.2d 664 (2000); *Capone v. Donovan,* 332 Pa.Super. 185, 480 A.2d 1249, 1251 (1984)("If the tortious conduct of two or more persons causes a single harm which cannot be apportioned, the actors are joint tortfeasors even though they may have acted independently."). And if parties are joint tortfeasors, they are "jointly and severally liable" to the plaintiff for his or her injuries. *Baker v. AC&S, Inc.,* 562 Pa. 290, 755 A.2d 664, 669 (2000) (citing *Incollingo v. Ewing,* 474 Pa. 527, 379 A.2d 79, 85 (1977)).

Furthermore, considering the apparent dearth of direct precedent on this issue, the analogies the Trustee draws between the current case and misconduct in the corporate context are also persuasive. *See* Supplemental Appeal Br., at 5–7. For example, the Trustee points out that the Pennsylvania Supreme Court has found that "[i]t is axiomatic that directors and officers of a corporation are jointly as well as severally liable for mismanagement, willful neglect or misconduct of corporate affairs if they jointly participate in the breach of fiduciary duty or approve of, acquiesce in, or conceal a breach by a fellow officer or director." *Seaboard Indus., Inc. v. Monaco,* 442 Pa. 256, 276 A.2d 305, 309 (1971). And, even more relevant to the determination of liability in a fraudulent transfer case, the Trustee also reminds this court that the Third Circuit has held that joint and several liability is appropriate in securities fraud cases "when two or more individuals or entities collaborate or have close relationships in engaging in the illegal conduct." *SEC v. Hughes Capital Corp.,* 124 F.3d 449, 455 (3d Cir. 1997) (citations omitted).

Therefore, joint and several liability is an available remedy in fraudulent transfer cases. Still, the decision to impose joint and several liability does fall

within the bankruptcy court's discretionary authority. As a result, I will review the bankruptcy court's decision for abuse of that discretion.

The bankruptcy court's conclusion that the Trustee was not entitled to a joint and several judgment against the Blatsteins rested at least in part on its erroneous conclusion that Lori was "an innocent nominal transferee." *Blatstein V,* 244 B.R. at 303. However, as noted above, I have concluded that this was an erroneous conclusion and that Lori is in fact liable to the Trustee for the fraudulent transfers. Therefore, the bankruptcy court's refusal to exercise its discretion to hold the Blatsteins jointly and severally liable rests upon an errant conclusion of law. As a result, the bankruptcy court's conclusion that the Trustee was not entitled to a joint and several judgment constitutes an abuse of discretion and it will be vacated. On remand, the bankruptcy court should exercise its discretion based upon the principles discussed above as well as the equities of the case.

C. Prejudgment Interest

The bankruptcy court also refused to grant the Trustee prejudgment interest. *Blatstein V,* 244 B.R. at 304–05. In deciding not to exercise its discretion to grant the Trustee prejudgment interest, the bankruptcy court primarily relied on two factors that distinguished this case from those cases in which prejudgment interest is generally granted. First, the bankruptcy court concluded that the sum which Blatstein was liable for was not "ascertainable by computation" at the outset of the litigation. *See id.* at 304. Second, the bankruptcy court found that the funds at issue in this case were "wrongfully transferred" as opposed to being "wrongfully procured or withheld" from the Trustee. *See id.* at 304–05.

The appellants ask this court to find that the bankruptcy court erred as a matter of law when it refused to award them prejudgment interest. *See* Appeal Br., at 47–48; Supplemental Appeal Br., at 10. In the alternative, the Trustee submits that the bankruptcy court's refusal to award it in this case was an abuse of discretion. *See* Supplemental Appeal Br. at 9–10.

Under Pennsylvania law, prejudgment interest is awardable as of right in contract cases. *See Fina v. Fina,* 737 A.2d 760, 770 (Pa.Super.Ct.1999). In other cases, prejudgment interest is an equitable remedy awarded at the discretion of the trial court. *See Somerset Cmty. Hosp. v. Allan B. Mitchell & Assoc.,* 454 Pa.Super. 188, 685 A.2d 141, 148 (1996). In cases where there is no conclusive precedent, the Pennsylvania Supreme Court has encouraged courts to take a flexible approach in deciding whether to award prejudgment interest. *See Murray Hill Estates, Inc. v. Bastin,* 442 Pa. 405, 276 A.2d 542, 545 (1971). In such cases, courts may, for example, consider the following factors in evaluating a claim for prejudgment interest: 1) whether the claimant has been diligent in prosecuting the action; 2) whether the defendant has been unjustly enriched; 3) whether an award would be compensatory; and 4) whether the award of prejudgment interest is otherwise equitable. *See American Mut. Liability Ins. Co. v. Kosan,* 635 F.Supp. 341, 346 (W.D.Pa.1986). However, it should be noted that in cases where " 'a defendant holds money or property which belongs in good conscience to the plaintiff, and the objective of the court is to force disgorgement of [the defendant's] unjust enrichment,' " the Superior Court of Pennsylvania has held that prejudgment interest "is a part of the restitution necessary to avoid injustice." *Kaiser v. Old Republic Ins. Co.,* 741 A.2d 748, 755 (Pa.Super.Ct.1999).

In this case, the bankruptcy court denied prejudgment interest primarily because it found that the sum claimed by the Trustee was not "ascertainable by computation" at the outset of the litigation. The bankruptcy court's reliance on this line of reasoning is of limited usefulness for two reasons. First, the precedents the bankruptcy court cites are inapplicable because this is not a contract dispute. Second, even if this inquiry were relevant, the sums involved in this case were clearly ascertainable by computation. According to the Pennsylvania Supreme Court, in contract cases, prejudgment interest "is *a right* which arises upon breach or discontinuance of the contract provided the damages are then ascertainable by computation and even though a bona fide dispute exists as to the amount of the indebtedness." *Palmgreen et al. v. Palmer's Garage, Inc.*, 383 Pa. 105, 117 A.2d 721, 722 (1955) (emphasis added). However, if the sum involved in a contract case is not ascertainable at the time of the alleged breach, a court may still award prejudgment interest as an equitable remedy. Because these proceedings do not stem from a contract dispute, it was already clear that the Trustee was not *entitled* to prejudgment interest.

Even if this inquiry were relevant, the sums involved in this case were clearly ascertainable by computation. Instead of disputing the amount of money that was transferred to Lori on a particular day, the Blatsteins only dispute the Trustee's claim that the transfers were fraudulent. Furthermore, the Pennsylvania Supreme Court has held that a "bona fide dispute [ ] as to the amount of indebtedness" does not negate a plaintiff's right to prejudgment interest. *Palmgreen*, 117 A.2d at 722. The disagreement between the Trustee and the Blatsteins as to the legal significance of the Blatsteins' actions is clearly a bona fide dispute. As a result, the court's discussion about whether the sum in dispute was ascertainable at the outset of litigation is only relevant to the extent that it suggests whether or not an award of prejudgment interest would be equitable.

The bankruptcy court also denied the Trustee prejudgment interest because the funds at issue in this case were "wrongfully transferred" as opposed to being "wrongfully procured or withheld." *Blatstein V*, at 304–05 (citing *Rizzo v. Haines*, 520 Pa. 484, 555 A.2d 58, 70 (1989)). The bankruptcy court states that *Rizzo* stands for the principle that "pre-judgment interest may [ ] be awarded if, in the discretion of the court, such an award is necessary to compensate a party from whom funds have been wrongfully procured or withheld." *Blatstein V*, at 304 (citing *Rizzo*, 555 A.2d at 70). However, this is clearly a misreading of *Rizzo*. In *Rizzo*, the appellant Haines was arguing that "the Superior Court erred in calculating interest on the $50,000 transfer at the market rate rather than the statutory rate." *Rizzo*, 555 A.2d at 69. The passage cited by the bankruptcy court stands for the principle that, when "funds are wrongfully and intentionally procured or withheld from one who seeks their restoration," prejudgment interest should be calculated at the market rate, as opposed to the lower statutory rate. *See Rizzo*, 555 A.2d at 70. It does not stand for the principle that prejudgment interest should not be awarded at all if the funds in dispute were "wrongfully transferred" as opposed to being "wrongfully procured or withheld." As a result, as with its discussion of whether the sum in dispute in this case was "ascertainable by computation," the bankruptcy court's reliance on this line of reasoning is misguided.

These two faulty lines of reasoning were the main grounds the bankruptcy court gave for denying the Trustee's request for prejudgment interest. Therefore, I con-

clude that the bankruptcy court's denial of the Trustee's request for prejudgment interest rests upon errant conclusions of law and improper applications of law to fact. As a result, the bankruptcy court's conclusion that prejudgment interest was "unwarranted" constitutes an abuse of discretion. On remand, the bankruptcy court should exercise its discretion based upon the principles discussed above as well as the equities of the case.

D. Other Equitable Relief

The bankruptcy court also denied the Trustee's request for equitable remedies to aid him in his effort to collect the judgment against Blatstein. *See Blatstein V*, 244 B.R. at 305. However, because the bankruptcy court's findings are sparse, it is difficult to discern the bankruptcy court's basis for refusing to exercise its discretion to grant the Trustee's request for equitable remedies. *See id.* at 304–05.

Citing the Blatsteins' history of fraudulent transfers and other improper or illegal conduct, the Trustee claims that he is entitled to unspecified equitable remedies to ensure that the judgment is satisfied. *See* Appeal Br., at 48–50. The Trustee argues that the bankruptcy court erred as a matter of law because "the record in this case compels the Court to invoke the equitable powers provided by the PUFTA and the Bankruptcy Code." *Id.* at 49. At oral arguments, the Trustee admitted that his brief failed to identify the equitable remedies he is seeking, and, for the first time, the Trustee asked this court to impose a constructive trust on the Blatsteins' assets.

Whether to grant a request for equitable remedies to aid the Trustee in his effort to collect a judgment falls within the bankruptcy court's discretionary authority. Therefore, I will review the bankruptcy court's decision for abuse of discretion.

Because the bankruptcy court's findings on the balance of the equities are sparse, I am unable to determine whether the decision to deny the Trustee further equitable relief "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." In particular, I am unable to discern whether the bankruptcy court's conclusion rests upon its erroneous conclusion that Lori was not liable for the fraudulent transfer. As a result, I will vacate the bankruptcy court's refusal to grant the Trustee's request for equitable relief, and, on remand, the bankruptcy court may reassess the request in light of this opinion.

## CONCLUSION

The bankruptcy court's January 21, 2000 order will be affirmed in part and vacated in part.

The bankruptcy court's conclusion that the statute of limitations barred claims arising from transfers Blatstein made prior to February 1, 1994 will be affirmed. This court will also affirm the bankruptcy court's finding that Blatstein fraudulently transferred $1,533,428.65 to Lori between October 3, 1995 and December 19, 1996. Similarly, I will affirm the bankruptcy court's conclusion that the Trustee cannot recover Blatstein's postpetition fraudulent transfers. However, the bankruptcy court's conclusion that Blatstein did not make any fraudulent transfers to Lori prior to October 3, 1995 will be vacated.

I will also affirm the bankruptcy court's decision that the Trustee is entitled to a judgment against Blatstein for the amount of money the bankruptcy court found that Blatstein fraudulently transferred to Lori. However, I will vacate the bankruptcy court's conclusion that the Trustee was not entitled to a judgment against Lori because she was not an initial transferee.

724

Similarly, the bankruptcy court's conclusion that the Trustee is not entitled to a joint and several judgment against the Blatsteins will be vacated, as will its determinations that the Trustee is not entitled to prejudgment interest or other equitable remedies.

The matter will be remanded to permit the bankruptcy court to make further factual findings and legal conclusions consistent with this memorandum.